**Sharon GREEN, Plaintiff,**

v.

**Johanna LINDSEY, Defendant.**

**No. 91 Civ. 3668 (MBM).**

United States District Court, S.D. New York.

Dec. 8, 1992.

Ken Sutak, Schlesinger & Sussman, New York City, for plaintiff.

Stephen F. Huff, Tom J. Ferber, F. Robert Stein, Pryor, Cashman, Sherman & Flynn, New York City, for defendant.

**OPINION AND ORDER**

MUKASEY, District Judge.

In this copyright infringement action, plaintiff, who is the author of the science fiction novel *The Warrior Within*, sues defendant, the author of the futuristic romance novel *Warrior's Woman*, alleging that these two high-tech bodice-rippers[1] are substantially similar and therefore that her copyright has been infringed. Defendant moves for summary judgment pursuant to Fed. R.Civ.P. 56 on the basis that the two works do not contain substantial similarities, and that those similarities that do exist do not involve copyrightable material. For the reasons set forth below, defendant's motion is granted.

I.

Plaintiff, Sharon Green, is the author of approximately 20 books, most of which are science fiction. (Mainhardt Aff. ¶ 2) In publishing parlance, she is a "mid-list" writer—that is, an "average professional book writer" whose contract advances average between $6,500 and $7,500 per book. (*Id.* ¶ 5) As of December 31, 1989, *The Warrior Within* had sold 56,868 copies. (*Id.* ¶ 3)

Defendant, Johanna Lindsey, a "brand name" writer, is the author of approximately 20 best-selling romance novels, each of which has sold at least 700,000 copies. (*Id.* ¶ 5; Ferber Aff. Ex. H) *Warrior's Woman* was on *The New York Times* and *Publisher's Weekly* best-seller lists for about five weeks during the summer of 1990. (Mainhardt Aff. ¶ 5)

The claims in this case necessitate a more detailed review of these works than their literary merit would either warrant or induce. That review may be easier to follow if their plots first are summarized. This artless judicial pen could craft no better sum-maries than the ones that adorn the back cover of each novel, as follows:

*Warrior's Woman*—In the year 2139, fearless Tedra De Arr sets out to rescue her beleaguered planet Kystran from the savage rule of the evil Crad Ce Moerr. Experienced in combat but not in love, the beautiful, untouched Amazon flies with Martha, her wise-cracking, free-thinking computer, to a world where warriors reign supreme—and into the arms of the one man she can never hope to vanquish: the bronzed barbarian Challen Ly–San–Ter. A magnificent creature of raw yet disciplined desires, the muscle-bound primitive succeeds where no puny Kystran male had before—igniting a raging fire within Tedra that must be extinguished before she can even *think* of saving her enslaved world . . . (emphasis in original)

*The Warrior Within*—She was one of Earth's most valued Primes—a brilliant and highly trained operative with a special talent for predicting accurately the thoughts and actions of others. He was a barbarian chief from a raw and primitive planet, wise only in the ways of warfare and the schemes of clan domination. His world had become a much needed key to Earth's space enterprises . . . and he was prepared to make a deal if the star-people could help him win supreme power. So she was assigned to him. But the only way she could fulfill her mission was in the full native tradition. She must be locked into the five-banded chains of a warrior's slave girl—and live the role to the full.

A.  *The Warrior Within*

*The Warrior Within*, published in 1982, traces the adventures of Terrilia Reya, "Terry," who is a "Prime Xeno–Mediator" on the planet Central. As a prime, Terry is able to read and influence the emotions of humans and animals (*The Warrior Within*, Ferber Aff. Ex. C at 92–93), a talent which Central employs to facilitate sensitive interplanetary negotiations with alien cultures. As a result of her critical role in Central's foreign rela-

---

**1.** Such novels are so described "because of the desire-crazed hero's tendency to do exactly that." Alessandra Stanley, *Romance Novels Discover a*

*Baby Boom*, N.Y. Times, April 3, 1991, at A1 col. **2.** As it happens, *Warrior's Woman* also features more than a dollop of voluntary bodice doffing.

tions, Terry is among Central's elite and "can do anything that she wishes to do. No one has the right to direct her." (*Id.* at 79)

The story opens with Terry being given to Tammad sek L'lenda, a gigantic barbarian warrior from the primitive planet Rimilia. According to the customs of Rimilia, once Terry is "gifted," that is, once she is given to Tammad as a house present, she belongs to him and he may do what he wishes with her. In fact, Tammad makes immediate "use" of Terry against her will; in prosaic terms, he rapes her. (*Id.* at 13)

At first, Terry believes that her "gifting" was a mistake that will be corrected. However, she soon learns that her superior in the bureaucracy of Central, Murdock McKenzie, deliberately assigned her to assist Tammad in convincing his fellow Rimilians to join the interplanetary Amalgamation. Therefore, Murdock does nothing to undo the "gifting," and instead orders Terry to accompany Tammad to Rimilia. Furthermore, Murdock directs Terry to keep Tammad with her until they leave for Rimilia. (*Id.* at 23)

In the few days Tammad spends with Terry on Central, he regularly rapes and beats her (*see, e.g., id.* at 40–41, 62); he asserts and reasserts that she now is his possession and must obey him unconditionally and for all purposes. Despite Terry's attempts to resist Tammad, she finds him physically attractive and hates her body for "betraying her." In her words:

> No matter what *I* wanted, my idiot body was obviously aching for his touch. I'd never been that way with a man before, and it made no sense! Didn't my body know that a civilized man was preferable to a barbarian? That a civilized man would never rape it, never take from it what he wanted? A civilized man would wait to be given, and never simply *take!*

(*Id.* at 26–27 (emphasis in original))

Before Terry and Tammad leave for Rimilia, Terry takes Tammad to a "real"—a movie fed directly into the brain and thus experienced rather than merely watched and heard—about a woman's beating and rape by a merciless primitive man. Terry gives Tammad the female headset and takes the male headset for herself. (*Id.* at 68–70) Although Tammad apparently is familiar with the subject-matter of the real, the sex reversal "produces an unnatural strain" on him, causing him to move as if in a trance for the remainder of the day. (*Id.* at 70–71) However, by evening he has returned to himself and has no recollection of the real. Nonetheless, that night Terry dreams that he had been quivering in terror; she wakes up and vomits from her overwhelming guilt at having "destroyed" him. When she realizes he is unaffected, she is so grateful she "barely resented his [subsequent] use of [her]." (*Id.* at 72–73)

Two or three days after attending the real, Terry and Tammad leave for Rimilia. (*Id.* at 65) Once on Rimilia, they are escorted to the Central embassy. Tammad makes Terry don an *imad* and *caldin,* a sheer outfit worn by all Rimilian women. (*Id.* at 82–83) He also "bands" Terry with five chains: one around each of her ankles and wrists, and one around her neck. (*Id.* at 87) These chains signify his ownership of her, his choice of five chains ensuring that she will remain his. As one of the embassy employees explains to Terry, " 'Men will make offers for one-, two-, and three-banded girls, and sometimes even for four-banded ones, but a five-banded girl has to be fought for. Not many men are willing to face Tammad, not even for a green-eyed, dark-haired woman like you.' " (*Id.* at 86)

Once Terry is appropriately clad, she and Tammad begin their long journey to Tammad's home, and then to the Great Meeting of tribes, also known as the Ratanan, where the Rimilian warriors will decide whether to join the Amalgamation. Terry and Tammad travel by *seetar,* a "monstrously large" horse-like animal. (*Id.* at 88) Tammad explains that when the weather is clear, Terry must walk in his track; she is never allowed to ride a *seetar* herself because she "could not control a *seetar* even were it fitting for *wenda* [woman] to ride one alone...." (*Id.* at 88) Because they begin their journey amid heavy rains, Tammad offers to "let" Terry share his saddle. However, she scorns Tammad's "offer" to ride with him, choosing in-

stead to walk in his tracks despite the rain and mud.

At the end of their first day traveling, Terry falls to the ground in exhaustion. Tammad places her inside a tent, where she almost immediately begins to fall asleep. Just before she loses consciousness, Tammad speaks the special code word that reactivates her empathetic powers. (*Id.* at 89–91)

During the journey to Tammad's home, Terry twice attempts to leave Tammad and fend for herself. Both times, however, Tammad saves her in the proverbial nick of time, once from a wild (and hungry) beast, and once from two lustful men. (*Id.* at 97, 107–11) He later beats her for her transgressions and she begins to believe that she

> was to be trapped on that terrible planet forever. Something would go wrong with the barbarian's plans, I would be blamed, and then I would be given away. No one would listen when I asked to be taken to the embassy, and I would never see Central or my friends again. Throughout the long day I'd thought about that, and I was completely resigned to my fate. I had no chance of escaping the brute who claimed to own me, and I would never escape the ones who owned me after him. I would be lost forever.

(*Id.* at 115–16)

Several days into their journey, Terry awakens to continued rain. During that day's ride, she becomes feverish and Tammad tends to her with a medicinal broth, which he predicts will cure her within a few hours. She proclaims that she does not want to be well, but would rather die so that she can be free again. (*Id.* at 119) However when Terry subsequently is faced with the prospect of death—in the form of yet another menacing wild beast—she realizes that she does not want to die. Therefore, she considers that she is properly relegated to the rank of slave. (*Id.* at 122) (Tammad earlier had said that, "If [a person] does not feel death preferable to slavery, slavery is the proper place for [that person].'" (*Id.* at 59))

During the final leg of the journey, Tammad and Terry are joined by a warrior friend of Tammad's, Fadden, and Fadden's *wenda*,

Doran. (*Id.* at 126) Tammad spends the night with Doran in order to impregnate her and thereby honor Fadden with a *denday* child, *i.e.*, the child of a warrior chief. Tammad gifts Terry for that same night to Fadden. (*Id.* at 126–35)

Shortly after this night of *wenda* swapping, Terry and Tammad reach Tammad's home. The remaining 81 pages of the book are divided evenly between the time Terry and Tammad spend in Tammad's home awaiting and preparing for the Ratanan, and the Ratanan itself. Both before and during the Ratanan, Terry helps Tammad by reading the minds of his fellow *l'lendaa* (warriors). Also during this time, she begins to fall in love with Tammad, and to crave and enjoy his "use" of her. However, she continues to resent that he owns her. In addition, he continues to punish her and, for a second time, swaps her for the *wenda* of another warrior. (*Id.* at 172) The warrior to whom Terry is "loaned" brutalizes her: "My *imad* and *caldin* were quickly removed, and he used me as *l'lendaa* do, but he also used me in the most embarrassing and humiliating of ways. I was helpless to stop him, my tears of frustration and shame simply giving him greater pleasure." (*Id.* at 175)

In addition to these unpleasant facets of her relationship with Tammad, Terry regrets what she perceives to be Tammad's failure to love her as a woman rather than to abide her as a useful object. Terry muses: "I wanted to be so many things to him, wanted so much to have everything I couldn't have." (*Id.* 153)

Tammad ultimately is victorious at the Ratanan, convincing the *l'lendaa* to join the Amalgamation. Just as Terry realizes the extent of her love for Tammad, and just as she realizes that she is pregnant with his child (although it is unclear how she knows that it is Tammad's child and not the child of one of the other *l'lendaa* who "used" her) Tammad sends her back to Central. Terry is devastated: "There was no sadness or regret in him, no loss of any sort. He was sending me back because my job was done, and he would not miss the Prime he had used. . . . my world was dead and gone." (*Id.* at 219)

## B. *Warrior's Woman*

*Warrior's Woman* opens with its heroine, Tedra De Arr, quelling a violent demonstration at a free-sex clinic on the planet Kystran in the year 2139 AC (After Colonization). Tedra is a "Sec 1," a member of Kystran's highest ranking security division; she is taller than the average Kystrani male and has the "highest rating for an expert in weapons and hand-to-hand combat." (*Warrior's Woman*, Ferber Aff. Ex. E at 3)

Ten pages into the story, Tedra learns that an evil leader, with the aid of huge, sword-wielding, barbarian mercenaries from the planet Sha–Ka'ar, has effected a military coup. (*Id.* at 10–11) In exchange for their assistance, the Sha–Ka'air are being allowed to abduct and enslave all female Secs.

Rourk Ce Dell, a close friend of Tedra's, quickly arranges for a change of Tedra's identity and requisitions a "Rover" spaceship so that she can escape Kystran. (*Id.* at 13) On her way to Rourk's, Tedra encounters two Sha–Ka'ari warriors, who menacingly proposition her. Tedra manages to separate them, taking only one back to Rourk's apartment, where she takes him down. (*Id.* at 22) However, Tedra does not want to kill this Sha–Ka'ari warrior because, as she explains to Rourk, the warrior "had his hands all over me and I didn't half mind it. Do you know how long I've been waiting for something like this to happen?" (*Id.* at 23) The reader thus learns that Tedra is a virgin, a rarity on a planet of free-sex stress reduction clinics, who has been unable to find a man who is her physical equal. (*Id.* at 6, 23, 29)

Tedra sets out on her Rover for some "world discovering" in view of Rourk's prediction that it may be years before it will be safe to return to Kystran. (*Id.* at 34) She takes her "free-thinking," wise-cracking computer, Martha, who is obsessed with Tedra's losing her virginity, and Corth, a sexcapable android whom Martha has programmed to attempt to seduce Tedra. (*See, e.g., id.* at 39–40)

As luck would have it, the first planet Tedra lands on turns out to be Sha–Ka'an, Sha–Ka'ar's mother planet. Sha–Ka'an is inhabited by a "warrior class of men," and

Tedra decides to try to enlist Sha–Ka'ani warriors to help her reclaim Kystran.

(*Id.* at 57–58)

Tedra teleports down to Sha–Ka'an, using a molecular transfer device, and immediately encounters a huge, sword-wielding barbarian warrior who, Tedra thinks, is "magnificent," "dominant maleness personified." (*Id.* at 64–65) He orders her to remove her clothes because she is wearing pants, which only warriors—male, obviously—are permitted to wear. When Tedra ignores his order, he attempts to remove her clothing himself. She stops him by stunning him with her phazor. (*Id.* at 66–68). While he lies stunned although, unbeknownst to Tedra, still conscious, she "examines" his body. (*Id.* at 69–70)

When the barbarian, Challen Ly–San–Ter, a *shodan*, *i.e.*, chieftain, regains his powers, he immediately knocks the phazor from Tedra's grasp. He ponders "claiming" her, which means that she would be unable to "deny her warrior's will" (*id.* at 77–78), or "using" her. He may do either under the laws of Sha–Ka'an because Tedra is unaccompanied by a man. However, "It was a law Challen had never taken advantage of before. Women came to the *shodan* for protection. . . . There had never been a need to find one to claim, when he had more than made for a peaceful household. Of course, those who sought his protection could not be used, did they not offer themselves for use." (*Id.* at 74)

Tedra attempts to explain to Challen that she cannot be claimed because she is from another planet and only on Sha–Ka'an for a business trip—to discuss with the Sha–Ka'ani *shodan* the possibility of hiring some warriors or trading for *Toreno* steel, the same steel used to make the Sha–Ka'ari swords. (*Id.* at 79) Challen simply "waves her to silence" (*id.*), and attempts to remove her clothes himself.

However, Tedra surprises him by flipping him over her head and onto the ground. Challen construes Tedra's actions as a "challenge" to a duel, which gives him the right to choose the weapons; the victor of a challenge can demand either death or a single type of

service from the loser. Challen chooses "weaponless combat" (*id.* at 81) and, not surprisingly, defeats Tedra; he demands one month's service from her in the place where he sleeps. (*Id.* at 85–90) Tedra realizes that for the first time since she became a Sec 1, she has been beaten. "A wave of vulnerability washed through her, and a thrill that flushed her cheeks and weakened her limbs. Here was a man she couldn't walk all over.... It seemed as if she'd waited forever for him, and she looked at him now wide-eyed, with a little awe and a lot of anticipation. She'd know sex-sharing at last." (*Id.* at 88–89)

Challen again demands that Tedra remove her clothes; she complies this time, and, standing naked before him, she is surprised and disappointed when he makes no move to "take advantage" of her. (*Id.* at 96–99) Tedra remains unaware that Challen's restraint results from his recent use of *dhaya* juice, a drug which temporarily suppresses a man's sex drive and which warriors take before hunting trips and raids so as not to be distracted. Therefore, Challen simply throws a blanket over her, binds her hands, albeit carefully so as not to chafe them, gags her, and carries her off. (*Id.* at 103–07) Challen explains his need to bind and gag her as a ritual of challenge loss—"to declare his or her status to all." (*Id.* at 104)

He punishes Tedra for her earlier disrespect. However, he does not punish her by beating or raping her. Rather, he sexually arouses her without providing any release, ultimately bringing her to tears of frustration. (*Id.* at 115–19) On seeing her tears, Challen apologizes. (*Id.* at 120)

Tedra is surprised by Challen's gentleness and decency:

No, she had to stop trying to pin kind and thoughtful qualities to his nature. He was a barbarian, after all, a dominant, arbitrary male. So what if he'd been incredibly gentle with her in every instance, even to cutting up her clothes to ensure that her wrists didn't get scraped by his scratchy rope. Come to think of it, he hadn't laid a single harsh hand on her even when they'd fought and she'd try to lay him low with

every blow. And when he did take hold of her, he was exceedingly careful about it. (*Id.* at 125)

Apparently, Challen shares some of Tedra's feeling. In fact, when the *dhaya* juice wears off and Challen feels overcome by his need to touch Tedra, he thinks: "He had bragged to her of a warrior's control. Where was it now?" (*Id.* at 150)

[H]e found her incredibly beautiful. She was using his arm as a pillow, but both her hands were wrapped around it, too, as if she felt in sleep what he had also felt, a need to hold tight to what he had found, a fear it might be lost otherwise. The fear was not unfounded on his part, not that he thought the woman would flee him. He had spoken true when he told her he trusted in her honor. There was not another woman he would have said that to....

(*Id.* at 15) Therefore, although Challen knows Tedra's resistance to him will be "like nothing he had ever encountered before," "he had decided from the moment he had gotten a closer look at her that she would be his." (*Id.* at 151)

He wakes Tedra and they begin her first "sex sharing experience." Although Challen does not know that Tedra is a virgin, he attempts to be gentle with her; so much so, that she begs him to get on with it. After this first "experience," they have sexual intercourse repeatedly. Indeed, Tedra appears to enjoy Challen so much that she has sex with him on a riverbank, without realizing that she had the option to resist because she was obligated to submit only in a place where he sleeps, which did not include a riverbank. (*Id.* at 172–73)

That afternoon, Challen and Tedra reach Sha–Ka–Ra, Challen's home. At the center of the city is a white castle which Tedra assumes to be the home of the *shodan.* She thus agrees to be the model of Sha–Ka'ani womanhood if Challen will take her to meet the *shodan;* Challen obliges. (*Id.* at 179–90) When they enter the castle and meet Challen's uncle, Tedra realizes that Challen in fact is the *shodan.* (*Id.* at 191–92) She is so angry that Challen withheld this information that she swiftly and effectively attacks both Challen and his uncle. Rather than being

angry with her, Challen acknowledges that he was wrong to have misled her, and therefore agrees not to punish her for attacking him and his uncle. (*Id.* at 195)

Her first full day at the castle, Tedra goes, unaccompanied and against Challen's wishes, to explore Sha–Ka–Ra. Challen's closest friend, Tamiron, saves her from two warriors who were threatening to claim her. (*Id.* at 225–35) But Tedra's transgression is not without consequences: Challen punishes her by not giving her dinner, making her feed him his dinner while seated naked atop him, and listing her "infractions." Finally, she begs him:

> "All right, barbarian . . . [i]f you're done listing all my heinous crimes, break out your whips and do your worst."
>
> "You *want* to be beaten?"
>
> "Yes," she said, and meant it. . . . [S]he wanted him to hurt her. She wanted pain to remember, to make her fear him, to make her dead inside when he touched her, to make her hate him for real, because even now she didn't.

(*Id.* at 245 (emphasis in original)) Challen accedes to her "wishes" by spanking her. (*Id.* at 245–49) However, her real punishment comes after she realizes that Challen simply was "humoring" when he spanked her. He forces her to suffer extreme and unsatisfied arousal for the better part of the night:

> It really was the most horrible experience of her life. Challen had brought her again and again to the point of hysterics, to where her need for him was so great she would have raped him if she could, to where she would have done anything, promised anything, for just one moment of the relief he could have given her. But relief wasn't part of the deal, only the constant need for it, and he never let that need diminish even a little.

(*Id.* at 252)

Although Tedra believes that Challen exhibited exemplary warrior's control during her night of torment, in fact Challen was simply showing the effects of another dose of *dhaya* juice. The proverbial morning after, he regrets the lack of "concern or mercy" he

exhibited while punishing Tedra and suffers "a guilt so strong, he wondered if he could ever face the woman again." (*Id.* at 257) In his guilt, he wanders into the forest where he inspects Tedra's phazor. As he plays with the buttons on the back, he inadvertently turns on the link to Martha. They speak about Challen's mistreatment of Tedra and Martha gives him advice about dealing with Tedra's anger. Martha also confirms Challen's growing suspicions that Tedra in fact comes from another planet despite his desire that she "be of his world, unimportant, claimable." (*Id.* at 271–72)

Tedra's anger slowly subsides and finally is erased by Challen's agreement to switch roles for the night—that is, his agreement that for a night she would act the part of the *shodan* while he acted the part of the challenge loser. (*Id.* at 295) However, at the seeming height of Tedra's sexual domination of Challen, she realizes that she wants her old role back because "she had become addicted to his special brand of domination. The helplessness it engendered was what took her outside of herself and joined her to him, making her feel totally possessed . . . making her feel—loved." (*Id.* at 307)

The next day, Challen is wounded fatally. Tedra convinces Tamiron that she is from another planet and that if he shows her where Challen put the phazor she will be able to save Challen. Tamiron reluctantly agrees, and Challen is restored, good as new. (*Id.* at 315–43) Challen then can no longer deny that Tedra is a "sky-flyer"; he also admits that he had been avoiding that knowledge because it required him to make her presence known to the other *shodani*. (*Id.* at 349) In return, Tedra admits to Challen that she has fallen in love with him. He responds only with, " 'I know.' " (*Id.* at 350) This infuriates Tedra and Challen tries to soothe her by explaining, " 'Women experience love, warriors do not.' " (*Id.*) However, Challen offers to return to Kystran " 'to do what must be done there that has importance to you, but then you will return with me here, and here you will stay.' " (*Id.*) He also pledges: " 'I give you my life, yours to keep until the day I die.' " (*Id.*) Challen's pledge inspires Tedra with "a feeling, which

thrilled her to her toes, that the big jerk loved her and didn't even know it." (*Id.*) Later, she learns that Challen's pledge constituted marriage vows. Soon after, he tells Tedra that she is pregnant, not a surprising disclosure but one disconcerting to Tedra because on Kystran babies pass through gestation in an artificial womb maintained by Population Control; women do not bear them. (*Id.* at 383–85)

Tedra and Challen return to Kystran with an army of Sha–Ka'an warriors. Although Challen fears that Tedra will be hurt in the ensuing conflict, "He had to war with his need to keep Tedra safe and his desire to let her be herself, which he had come to realize was what attracted him to her in the first place, her difference from other women. It was important to her to be part of the fighting." (*Id.* at 409)

In the battle over security headquarters, which ultimately is successful, Tedra is injured. When Challen sees her injured, he cries with grief and Tedra realizes that he does love her. He still is unable to tell her that he loves her, saying instead: " 'I treasure you more than my life.' ... Do you not know I would do anything for you, does it make you happy?' " (*Id.* at 418, 420)

On the last page of *Warrior's Woman*, Challen finally utters the ineluctable conclusion to this saga, as he tells Tedra, " 'Warriors do not love ... they should not ... but here is one who does. I love you, woman. My heart cries with how much I love you.' " (*Id.* at 422)

\*    \*    \*    \*    \*    \*

On May 31, 1991, plaintiff filed this action for copyright infringement, alleging that defendant's novel, *Warrior's Woman*, copied the total concept and feel of plaintiff's book, *The Warrior Within*. (Compl. ¶ 17) Defendant has moved for summary judgment, arguing that no reasonable juror could find that the two works are substantially similar, and that those similarities that do exist involve non-copyrightable material.

## II.

■ Fed.R.Civ.P. 56(c) requires a summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

Summary judgment historically has been withheld in copyright cases because courts have been reluctant to make subjective determinations regarding the similarity between two works. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.) (citing *Arnstein v. Porter*, 154 F.2d 464, 474 (2d Cir.1946)), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). However, "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar...." *Warner Bros., Inc. v. Am. Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983) (quoting *Hoehling*, 618 F.2d at 977) (emphasis in original)) (citation omitted), *aff'g* 530 F.Supp. 1187 (S.D.N.Y. 1982), *after remand*, 654 F.2d 204 (2d Cir.), *aff'g and remanding* 523 F.Supp. 611 (S.D.N.Y.1981).

■ To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). The copying element, in turn, consists of two elements. First, plaintiff must prove that defendant actually used plaintiff's work as a source of material or ideas for her own work. *Arnstein v. Porter, supra*, 154 F.2d at 468; *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.1986), *aff'g* 615 F.Supp. 430 (S.D.N.Y.1985), *cert. denied*, 476 U.S. 1159,

106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). Copying may be inferred from evidence of access and similarities between the copyrighted work and the accused work. *Arnstein*, 154 F.2d at 468; *see also Warner Bros.*, 654 F.2d at 207 (copying may be inferred "where a plaintiff establishes that the defendant had access to the copyrighted work and that the two works are substantially similar.").

Second, plaintiff must prove that defendant improperly appropriated copyrightable material. *Walker*, 784 F.2d at 48. Copying is actionable when defendant appropriates the economic value of the work as measured by the work's appeal to the public. If defendant has appropriated that value, she has undermined the incentive created by copyright law and has infringed plaintiff's copyright. To prevail, plaintiff must establish that, from the standpoint of the lay reader, the works are "substantially similar." *Hoehling*, 618 F.2d at 977; *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966) (L. Hand, J.) ("whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work"); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) ("[T]he patterns in which these figures are distributed are not identical. However, the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."); *Arnstein*, 154 F.2d at 473. Such substantial similarity appropriates the economic value of a plaintiff's work.

The protection afforded by copyright, however, does not extend to all aspects of an author's work. "It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *see also* 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1880). Similarly, *scenes a faire*, "sequences of events which necessarily follow from a common theme," are not protectible. *Reyher*, 533 F.2d at 91; *see also Walker*, 615

F.Supp. at 436 (incidents, characters, or settings that are "indispensable or standard in the treatment of a given topic" are not copyrightable). Thus, in an action for infringement, it must be determined both whether the similarities between the works are substantial from the point of view of the lay reader and whether those similarities involve copyrightable material. In *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), Judge Learned Hand articulated what has become a guiding principle in this elusive inquiry:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the general statement of what the play is about, and at times consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which apart from their expression, his property is never extended.

*See also* Z. Chafee, *Reflections on the Law of Copyright*, 45 Col.L.Rev. 503, 513 (1945) ("protection covers the 'pattern' of the work . . . the sequence of events and the development of the interplay of characters"); *but see Peter Pan Fabrics*, 274 F.2d at 489 (L. Hand, J.) (Where Judge Hand appeared to deprecate the value of *any* principle, including presumably his own: "Obviously no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc*.").

In the case at hand, plaintiff alleges that defendant has infringed her copyright because *Warrior's Woman*

> contains a substantial amount of material derived or adapted from the equivalent portions of plaintiff's novel, *The Warrior Within*, including but not limited to the 'total concept and feel' of plaintiff's novel, represented by, *inter alia*, the latter novel's 'plotline' or expressive arrangement of characters, incidents, and other elements either common to the *genre* of science fic-

tion or introduced by plaintiff's own contributions to this *genre.*

(Compl. ¶ 17)

### A. Ownership of A Valid Copyright

Plaintiff has submitted a copy of her certificate of copyright registration for *The Warrior's Within* as proof of her ownership of a valid copyright for *The Warrior Within* (Compl. Ex. A); defendant has not contested plaintiff's ownership of such a copyright.

### B. Actual Copying

As stated above, plaintiff may establish actual copying by submitting proof of access in conjunction with proof of sufficient similarities to create an inference of copying.

#### 1. Access

For purposes of the motion at hand, defendant has conceded access. (Def. Mem. at 7 n. 9) Accordingly, there is no need to explore the question of whether a portion of the dedication in *The Warrior's Woman,* "To ... Sharon, for inspiration ..." refers to plaintiff and thus shows at least that defendant had access to her works, and maybe something more sinister. Access has been conceded. Although plaintiff uses that dedication in aid of a misbegotten argument to support a finding of improper appropriation, *see* p. 481, *infra,* if the dedication is relevant at all it is to access and possibly to copying, both non-issues in this case, as explained more fully below.

#### 2. Similarity Sufficient to Raise an Inference of Copying

■ The parties have ignored the question of whether, in conjunction with defendant's concession of access, sufficient similarities exist to raise an inference of copying. Instead, the parties have addressed only the question of whether the two works contain substantially similar protected expression. The parties' omission of the second element of the actual-copying prong of the copyright test appears to have resulted at least in part from courts' use of the term "substantial similarity" to refer both to the similarity necessary to prove copying and the similarity necessary to prove improper appropriation.

*See, e.g., Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir. 1977); *cf. Warner Bros.,* 654 F.2d at 208 (stating that test for copyright infringement requires plaintiff to prove (i) ownership of a valid copyright, (ii) access, and (iii) substantial similarity between the copyrighted work and the accused work).

However, as Professor Latman points out, such use of the term "substantial similarity" is misleading not only in that it creates confusion between the "copying" and "improper appropriation" prongs of the *Arnstein* test, but also in that the similarity necessary to prove copying need not be substantial and need permit only an inference of copying. *See* A. Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths In Copyright Infringement,* 90 Colum.L.Rev. 1178, 1204 (1990); 3 *Nimmer on Copyright* ¶ 13.03[A] at 13–23 (1991).

Because the two so-called substantial similarity prongs of the copyright infringement test do differ, and because the parties in the case at hand have focused exclusively on the issue of substantial similarity of expression in connection with improper appropriation, and have not addressed the issue of whether sufficient similarities exist between the two works in question to create an inference of actual copying, I will assume for purposes of the motion at hand that sufficient similarities to create such an inference do exist and that the dedication in defendant's book suggests such an inference.

### C. Improper Appropriation

As stated above, in order to demonstrate improper appropriation, plaintiff must show that the average lay reader would perceive the two works in question to be substantially similar. Nonetheless, plaintiff has proffered several theories as to why she should not be required to prove substantial similarity in order to prevail on her copyright infringement claim. As summarized below, neither authority nor inclination permits me to rewrite Second Circuit law in aid of plaintiff's creative if somewhat opaque theories.

■ First, plaintiff argues that, because defendant has conceded access, plaintiff need

not prove that the two works are substantially similar. Rather, plaintiff contends that some lesser quantum of similarity will suffice to make out a prima facie case of copyright infringement under what is known as the inverse-ratio rule, which the Ninth Circuit articulated in *dictum* in *Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir.1977). Under the inverse-ratio rule, where clear and convincing evidence of access is presented, the quantum of proof required to show substantial similarity *may* be lower than when access is shown merely by a preponderance of the evidence. *Id.* at 1172. However, the inverse-ratio rule has been rejected by the Second Circuit and subsequently criticized by the Ninth.

In *Arc Music Corp. v. Lee*, 296 F.2d 186 (2d Cir.1961), the Second Circuit treated the inverse-ratio rule as follows:

> At best, its scope of application is small, since it can apply only to justify a result after a showing of similarity has been made. We fear that counsel with that semantic proclivity natural to our profession have allowed themselves to be seduced by a superficially attractive apothegm which upon examination confuses more than it clarifies.
>
> .    .    .    .    .
>
> Of course access shown either directly or indirectly is an element of plaintiff's case. And it is not an unnatural step in inference of fact for ease of access to suggest a deduction of copying when similarity is found. But access will not supply its lack.

*Id.* at 187–88. Similarly, in *Aliotti v. R. Dakin & Co.*, 831 F.2d 898 (9th Cir.1987), the Ninth Circuit affirmed the district court's refusal to apply the inverse-ratio rule, stating,

> Appellants, relying upon dictum in *Krofft* that was based upon Professor Nimmer's treatise, argue strenuously that the district court erred in failing to decrease the quantum of similarity required in this case, where [defendant's] access to her designs has been demonstrated. However, our finding that there exists no substantial similarity of protectable expression makes appellants' argument inapplicable, given that '[n]o amount of proof of access will suffice to show copying if there are no similarities.' ... We thus need not address the continuing viability of Professor Nimmer's proposal, which has been employed by no Ninth Circuit case since *Krofft* and had been earlier criticized for 'confus[ing] and even conceal[ing]' the requirement of substantial similarity.

831 F.2d at 902 (citing *Arc Music Corp.*, 296 F.2d at 186, 187–88).

Moreover, even if the inverse-ratio rule were good law in the Second Circuit, plaintiff misperceives the effect of that rule. The inverse-ratio rule, if applied, affects the quantum of proof of similarity necessary to create an inference of copying, it does not affect the quantum of proof of similarity, *i.e.*, substantial, necessary to prove misappropriation of expression. As stated above, because defendant failed to brief the issue of whether there exist sufficient similarities between the two books in question to create an inference of copying, I have assumed copying for purposes of the motion at hand. The quantum of proof necessary to prove what is already assumed is irrelevant.

■  Second, plaintiff argues that defendant's alleged evasive intent should be included in some unspecified way in the court's improper-appropriation analysis. According to plaintiff, "Unlike evidence of access or copying, evidence of evasion, or 'evasive motive,' does not necessarily lower the quantum of proof of substantial similarity required of the plaintiff. Instead, it becomes an 'additional factor' to be considered by the Court—to what effect in *substantial similarity* infringement cases no Second Circuit case has yet said." (Pl. Mem. at 65 (emphasis in original)) However, the cases cited by plaintiff for the proposition that evasive intent can be considered as an "additional factor" address the fair use defense, which presuppose defendant's appropriation of protected expression. The relevant inquiry in those cases necessarily must include an assessment of defendant's good or bad faith. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562–63, 105 S.Ct. 2218, 2231–32, 85 L.Ed.2d 588 (1985). By contrast, defen-

dant's good or bad faith is irrelevant to the critical question in misappropriation cases, namely, *whether* defendant has appropriated plaintiff's protected expression.

■ Moreover, even if plaintiff's legal theory regarding defendant's evasive intent were not frivolous, the evidence on which she relies to support this theory proves nothing. According to plaintiff, defendant's dedication at the beginning of *Warrior's Woman,* "To ... Sharon, for inspiration....," demonstrates defendant's evasive intent. However, even if that dedication does refer to plaintiff, it is irrelevant. The copyright laws attempt to "reconcile two competing societal interests: rewarding an individual's ingenuity and effort while at the same time permitting the nation to benefit from further improvements or progress resulting from others' use of the same subject matter." *Reyher,* 533 F.2d at 91. In other words, that balance is designed in part to prevent authors from monopolizing ideas to the extent of inhibiting "inspiration" of subsequent works. In sum, plaintiff's evasive intent theory is without basis in either fact or law.

■ Third, plaintiff proposes a novel reading of *Reyher v. Children's Television Workshop, supra*—the first Second Circuit case to recognize "total concept and feel" as an actionable basis for copyright infringement—that would preclude a comparison of the "total concept and feel" of *The Warrior Within* and *Warrior's Woman.*[2] In *Reyher,* the Court held that defendant's work did not infringe plaintiff's protected expression even though both defendant's and plaintiff's work narrated similar stories: a child is separated from his or her mother, the lost child describes the mother as the most beautiful woman in the world, and the child ultimately is reunited with the mother, who in reality is quite plain. The Court's determination was premised on its finding that the morals of the two stories were different, that the similarity of events constituted unprotected *scenes a faire, i.e.,* that the similarities necessarily flowed from the common *idea* underlying the stories, and most importantly, that the two works differed in total feel because they were "not similar in mood, details or characterization." *Id.* at 92.

Plaintiff theorizes that *Reyher* effected, or at least recognized, an objective/subjective bifurcation of the substantial similarity test between all narrative elements other than total concept and feel (denominated "objective" by plaintiff), and total concept and feel (denominated "subjective" by plaintiff). Plaintiff reads this alleged bifurcation into *Reyher*'s statement that, "We must first note that both stories, intended for children, are necessarily less complex than some other works submitted to pattern analysis. *Therefore,* in addition to the essential sequence of events, we might properly consider the 'total concept and feel' of the works in question." *Id.* (emphasis added) (citations omitted) (quoting *Roth Greeting Cards v. United Card Co.,* 429 F.2d 1106, 1110 (9th Cir.1970)). According to plaintiff, "This critical 'therefore'—implying either plaintiff's *failure* to satisfy the objective test, or else the *unsatisfactory nature* of applying objective criteria to a simplistic literary works case, *as a precondition* to applying the subjective test in such a case—has lain dormant for fifteen years in the Second Circuit." (Pl. Mem. at 21 (emphasis in original)) What plaintiff seems to be saying is if the story is sufficiently complex to generate enough "objective" points of comparison, the "subjective" test—total concept and feel—may not be employed.

Contrary to plaintiff's abstruse theory, the Second Circuit has never restricted application of the total concept and feel test. Rather, courts have applied the total concept and feel test to all manner of literary and/or dramatic works, considering total concept and feel in conjunction with those elements plaintiff labels "objective." *See, e.g., Walker, supra,* 784 F.2d at 50; *Warner Bros., supra,* 654 F.2d at 211 (finding no actionable similarity between character Superman and the "Greatest American Hero" because the "pattern of scenes, sequence of incident, principal characters, and general theme" are not substantially similar; "[q]uite to the contrary,

---

**2.** This is an odd theory for plaintiff to argue; in her Complaint, she alleges that *Warrior's Woman* infringes *The Warrior Within* by copying its "total concept and feel." (Compl. ¶ 17)

... the 'total concept and feel' of the two works greatly differ." (quotation omitted); *Zambito v. Paramount Pictures Corp.,* 613 F.Supp. 1107 (E.D.N.Y.), *aff'd without op.,* 788 F.2d 2 (2d Cir.1985). Therefore, the total concept and feel of the two works at issue properly may be considered, in addition to theme, plot, pace, setting, characters, and style, on this motion for summary judgment.

I now turn to the relevant inquiry at hand, a comparison of *The Warrior Within* and *Warrior's Woman.* At the outset, plaintiff concedes that the mood of the two works is materially different. (Pl. Mem. at 77) Similarly, the tone of the two works differs. While plaintiff's *The Warrior Within* is a serious and somber action-filled science-fiction novel, with a tendency toward the sado-masochistic, *Warrior's Woman* is a light-hearted romance filled with consensual and seemingly enjoyable sex, as well as with bantering and humorous (if not exactly funny) dialogue between the main characters. Moreover, the tonal difference is reinforced by the two works' entirely different endings—Tammad's apparent rejection of Terry in *The Warrior Within* compared with the happily-ever-after ending of *Warrior's Woman.* Although plaintiff argues that the endings are not "really" different because plaintiff's book is the first in a series about Terry (Sutak Aff. ¶ 71), who ultimately lives happily ever after with Tammad, what transpires between Terry and Tammad in subsequent installments is beyond the scope of the relevant inquiry—namely, a comparison of *The Warrior Within* and *Warrior's Woman.*

Although plaintiff would diminish the significance of differences between the mood and tone of the two works in the substantial similarity determination, these elements in fact have been recognized as critical to such a determination. For example, in *Bevan v. Columbia Broadcasting System, Inc.,* 329 F.Supp. 601 (S.D.N.Y.1971), the court stated that, although the alleged similarities between plaintiffs' copyrighted play, *Stalag 17,* and defendants' television series, *Hogan's Heroes,* were "[q]uantatively impressive," a comparison of "the dramatic mood, the details and interplay of the characters, and the dynamic of events indicates ... substantial dissimilarity...." *Id.* at 605. On the basis of the district judge's finding that the characters and their interrelationships, as well as the thematic and episodic content followed the "basic tonal difference" between the two works, he granted defendants' motion for a judgment notwithstanding the jury's verdict in favor of plaintiff.

In the case at hand, plaintiff also admits that defendant left "comparatively little untouched" (Pl. Mem. at 78), allegedly creating *Warrior's Woman* by a "process of variations." (Pl. Mem. at 79). However, plaintiff contends that defendant, in order to effect her "adaptive taking," "tracked the plot and theme of *The Warrior Within,* ... [and] used substantially the same sequence of events, settings, pace, and characters. Defendant also took a stylized English language barbarian dialect" from *The Warrior Within.* (Pl. Mem. at 78 (emphasis omitted))

### 1. Theme

First, plaintiff claims that the title of her work and the title of defendant's work are similar and communicate the two works' common underlying theme. (Sutak Aff. ¶¶ 5–6) According to plaintiff, the theme of both works in question can be summarized as:

> "[A] courageous, independent young woman, pressed into servitude under a domineering barbarian overlord, will not exhibit the servility of a 'slave,' but will rather draw upon her inner resources of feisty resistance ('the warrior within' herself), until she eventually wins the respect, and even love, of her warrior 'master,' so as to prove herself a true 'warrior woman' before the period of indenture ends."

(*Id.* ¶ 6) Regardless of the accuracy of this summary, which defendant disputes (Def. Rep. Mem. at 27 n.*), the title of defendant's book in no way communicates this putative theme. The title *Warrior's Woman* superficially communicates less about Tedra's strength in the face of adversity, than it communicates about Challen's possessiveness and perhaps affection for her.

Even if plaintiff were correct in arguing that the respective titles capture the alleged "warrior woman" theme, such broad themes

are not copyrightable under Judge Hand's abstractions test. *See Nichols,* 45 F.2d at 122 (finding that "A comedy based on conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible to copyright protection than the outline of Romeo and Juliet."). Moreover, in her Memorandum in Opposition to Summary Judgment, plaintiff admits that this central theme "was not a new idea when *The Warrior Within* was written, and even if it had been, it would not be protectible." (Pl. Mem. at 75) Therefore, neither the title of *Warrior's Woman* nor its purported theme is eligible for protection.

Furthermore, it is worth noting that plaintiff avers that she "conceived of the 'Terrilian' series in order to respond" to John Norman's *Gor* series. (Green Aff. ¶ 16; *see* Ferber Aff. Ex. I) Specifically, plaintiff contends that Norman's *Gor* books

> advocate the idea that women are naturally (i.e., genetically) servile to men in their most feminine (i.e., natural) state, and the converse of this idea: that men are naturally (i.e., genetically) meant to be the masters of women, and attain their most masculine (i.e., natural) state by completely subjugating women. Moreover, the "natural" servility of women often takes the form of complete obeisance to their male masters in the "Gor" books, while the "natural subjugation of women includes the torture of women. . . ."

(Green Aff. ¶ 15) According to plaintiff, her attack on these ideas "was expressed through the actions" of Terry and Tammad "over the course of three related episodes that appear early in *The Warrior Within*" and relate to Terry's experience with the pornographic real called "Tree World Adventure." (*Id.* ¶¶ 18–24) Significantly, plaintiff concedes that these three episodes have no analogues in *Warrior's Woman.* (Sutak Aff. ¶¶ 25–27) Certainly, then, plaintiff's expression of her self-proclaimed core theme has not been appropriated by defendant.

### 2. Plot

Plaintiff has dissected *The Warrior Within* and *Warrior's Woman,* alleging numerous discrete similarities between the two plots.

However, upon consideration, these alleged similarities either are not similarities at all, or they involve unprotected *scenes a faire.* As to those elements that relate to the science fiction/futuristic nature of the two books, plaintiff maintains that similarities exist between (i) the Central Amalgamation in *The Warrior Within* and the Centura League of Confederated Planets in *Warrior's Woman* (Sutak Aff. ¶ 7), (ii) between Terry's "teaching machine" in *The Warrior's Woman* and Tedra's "Sublim" in defendant's novel (*id.* ¶ 8), (iii) between the scenes in which wild beasts attack the protagonists in each of the books (*id.* ¶ 44), and (iv) between the fictional animals used for transportation in each of the books. (*Id.* ¶ 43) However, an inspection of these alleged similarities reveals that defendant's expression of these stock elements differs markedly from plaintiff's and, to the extent that similarities do exist, they are stock science-fiction elements, and thus are unprotectible *scenes a faire. See Walker,* 784 F.2d at 50 ("Neither does copyright protection extend to copyright or 'stock' themes commonly linked to a particular genre."); *Conan Properties, Inc. v. Mattel, Inc.,* 712 F.Supp. 353, 359 (S.D.N.Y.1989) ("*scenes a faire* that inhere in [a] genre" are not protectible).

First, plaintiff claims that a substantial similarity exists between plaintiff's description of the "Central Amalgamation," "a league of planets dedicated to interplanetary trade and diplomatic projects," and plaintiff's description of the "Centura League of Confederated Planets, another league of planets devoted to peace and profitable trade among members." (Sutak Aff. ¶ 7) However, the "league of planets" is a basic, unprotectible science-fiction convention. *See, e.g., Star Trek* ("the Federation") (1966–69). Moreover, the league of planets plays a different role in each of the books in question. In *The Warrior Within,* the league of planets is critical to Terry's mission—namely, to convince Rimilia to join the Amalgamation. (*See* Ferber Aff. Ex. C at 23) By contrast, in *Warrior's Woman,* the league of planets appears to be included only to enhance the book's futuristic tone, and to contrast the backwardness of Sha–Ka'ar, which does not belong to the 78–member league of confeder-

ated planets, with Kystran, which ranks twelfth in importance among the member planets. (*Id.* Ex. E at 18)

Second, plaintiff claims that a similarity exists between Terry's and Tedra's knowledge of multiple languages. Plaintiff asserts that, "Terry knows the languages and customs of every world known to the Central Amalgamation; she has learned them from sessions with a 'teaching machine.' ... Tedra speaks every language on file with the Centura League of Confederated Planets; she has learned them by sleeping on a 'Sublim'...." (Sutak ¶ 8 (citations omitted)) However, plaintiff has given no original expression to the stock futuristic idea of effortless, subliminal learning. Moreover, the inclusion of this learning device follows from each heroine's elite status in a "league of planets" member planet.

Third, plaintiff argues that *The Warrior Within* and *Warrior's Woman* contain similar scenes in which fictional wild beasts attack the respective protagonists. (Sutak ¶ 44) In *The Warrior Within*, Terry and Tammad are attacked by a charging *fazee*, some type of fictional wild beast. (*Id.* Ex. C at 94) Terry alerts Tammad to the danger of *fazee* "just barely in time," and Tammad kills the beast with his sword. (*Id.*) Challen and Tedra also are attacked by a savage wild beast, a *sa'abo*. (*Id.* Ex. E at 175–78) However, not only is such an attack a standard device for demonstrating the dangers of the alien world and the strength of the male protagonist (*see, e.g., Fires of Winter*, Ferber Aff. Ex. G at 210–11 (wild bear attack); *Captive of Gor*, Ferber Aff. Ex. I at 154–56 ("sleen" attack)), but the purpose and tenor of the scene in *The Warrior Within* differs from the purpose and tenor of the scene in *Warrior's Woman*.

In *The Warrior Within*, Terry expands the *fazee's* inner node of fear, causing the *fazee* to stop and howl in agony. Tammad then is able to kill the *fazee*. (Ferber Aff. C at 94–95) The *fazee's* attack alerts Terry to her vulnerability on Rimilia, while it also demonstrates the power of Terry's talent to Tammad, who recognizes that the *fazee* acted abnormally. (*Id.* at 95) By contrast, while the *sa'abo's* attack in *Warrior's Woman* dem-

onstrates Tedra's vulnerability on Sha–Ka'an, it also demonstrates her concern for Challen, her unhappiness with herself for caring about his welfare, and his happiness with her concern. The dialogue and narrative at the end of the scene, like most of the dialogue and narrative in this genre, first portray the banal and then make it explicit:

> "Were you concerned for me, *kerima*?"
>
> "Certainly not," she snorted....
>
> "Then that was not your scream I heard?"
>
> "Must have been some bird," she quipped.
>
> To her chagrin, Challen threw back his head and laughed at the blatant lie. And he started toward her, and she was beginning to think she could read minds, for she had little doubt what was now on his.
>
> She put out a hand to stop him [and suggested they move on].... He didn't answer, but surprisingly, he did do as she suggested. Yet he was smiling in a very pleased way as he turned toward the stream, and Tedra could guess why. The farden warrior liked the idea that she'd been concerned about him. She, on the other hand, didn't like it at all.

(*Id.* Ex. E at 178) Therefore, the two attacks differ in all but the general idea, which is unprotectible.

Finally, plaintiff points to the fictional animals used for transportation in both *The Warrior Within* and *Warrior's Woman*. (Sutak Aff. ¶ 43) While Tammad rides a *seetar* (*see* Ferber Aff. Ex. C at 88), a large horse-like animal, Challen rides a *hataar*, a giant feline. (*see id.* Ex. E at 95) However, there is nothing novel about the idea of primitive transportation via fictional animals. *See, e.g., Captive of Gor*, Ferber Aff. Ex. I at 65 (slave wagons were drawn by "bosk," large oxen-like animals). Nor has plaintiff alleged that defendant's specific expression of this general idea is substantially similar to plaintiff's own expression. Therefore, no copyrightable expression is involved in this alleged similarity.

Plaintiff also alleges several similarities between *The Warrior Within* and *Warrior's Woman* that relate to the romance/captor

strain of the two books. Plaintiff alleges that (i) Tedra's servitude to Challen, (ii) Challen's possessiveness of Tedra, (iii) the aggressive sex they share, (iv) the punishments he imposes on her, (v) his removal of her clothes, and (vi) his banding of her are substantially similar to analogous events in *The Warrior Within.* However, as with the alleged similarities between the science fiction elements of the two books, defendant's use of these stock romance devices is generally substantially different from plaintiff's, and to the extent that similarities exist, they involve unprotectible *scenes a faire.*

First, Tedra's servitude to Challen results, at least in part, from her desire for him. Had Martha not perceived that Tedra desired Challen, Martha would have retransferred Tedra to the Rover. (Ferber Aff. Ex. E at 273) Moreover, Challen never rapes Tedra, nor does he beat her—except once, when she begs him to beat her and he spanks her. (*Id.* at 245–49) In addition, the very terms of Tedra's indenture show that her relationship with Challen will be unlike any previous relationship he has had with a woman; Tedra is the first female challenge loser.

By contrast, Terry is "gifted" to Tammad against her will and is raped immediately by him. He also repeatedly whips her. She attempts to run away from him, to fend for herself, and only her inability to survive on her own on Rimilia forces her initially to accept her servitude. Although she comes to accept her subjugation more wholeheartedly, and even to love Tammad, his feelings for her are never made clear, and his dominating and authoritative demeanor never abates. By contrast, although Tedra must do Challen's bidding in "the place where he sleeps," the tenor of her relationship with Challen is predominantly one of mutual desire and growing affection—*viz.,* the dalliance on the riverbank, not a "place where he sleeps." Because the tenor of Tammad's possession of Terry differs materially from the tenor of Challen's possession of Tedra, and because the structure of their respective relationships inheres in the romance/captor genre, no protectible expression is included in the alleged similarities between the female protagonists'

servitude to the male protagonists in the two books.

Second, plaintiff alleges that the possessiveness demonstrated by Tammad and Challen is substantially similar. However, Tammad's and Challen's possessiveness of the respective heroines is a stereotypical characteristic of a dominant male. Moreover, plaintiff's and defendant's specific expression of this general characteristic differs. In *The Warrior Within,* when a colleague and friend of Terry's puts his arm around her shoulders, Tammad intervenes saying, " 'It is not fitting for a man to touch unbidden the belonging of another.' " (Ferber Aff. Ex. C at 22) This scene expresses Tammad's possession of Terry as an object, and thus her corresponding loss of independence; it does not communicate any jealousy on Tammad's part, as is clear from Tammad's subsequent gifting of Terry to other *l'lendaa.* (*See, e.g., id.* at 126–35)

By contrast, in *Warrior's Woman,* when Rourk and Tedra are reunited and Rourk greets Tedra by putting his arm around her, Challen becomes jealous; he gives Rourk a "don't touch-my-woman-again look." (*Id.* Ex. E at 401) Moreover, Challen's jealousy is integral to the denouement of *Warrior's Woman, i.e.,* Challen's admission that, despite being a warrior, he loves Tedra. Therefore, Tammad's and Challen's possessiveness also involves no protectible similarity of expression.

Third, plaintiff claims that Tammad and Challen similarly "band" their "women." (Sutak Aff. ¶¶ 40–42) However, the indicia of ownership that Tammad and Challen require Terry and Tedra, respectively, to wear also differ. In *Warrior's Woman,* Challen demands that Tedra remove the clothes she is wearing when they first meet because her pants are "warrior's clothes." He then requires her to wear the sheer clothing of Sha–Ka'ani women, only the color of which declares that she is claimed by him. In *The Warrior Within,* Tammad also makes Terry wear the sheer outfit worn by Rimilian women. However, his ownership of her is signified by chains around her wrists, ankles, and neck, yet another example of the harsher tone of plaintiff's expression as compared to

defendant's more innocuous tone. Therefore, here too there are no protectible similarities.

Finally, plaintiff claims that *The Warrior Within* and *Warrior's Woman* are substantially similar in their treatment of sex and punishment. (Sutak Aff. ¶¶ 22–23, 33, 36) Specifically, plaintiff claims that both books contain "aggressive sex with the dominant, demanding 'man for you,'" and that "many of the *non*-detailed allusions to such sexual activity are essentially the same between both books...." (*Id.* ¶ 22) However, implicit in this claim is the concession that the details of that sexual activity, or lack thereof in the case of *The Warrior Within*, differ. In fact, much of defendant's book is devoted to detailed albeit not clinical descriptions of Challen's and Tedra's sexual activity. By contrast, by plaintiff's own admission, *The Warrior Within* contains no detailed sex scenes. Consequently, rather than constituting a similarity between the two books, the sex scenes of *Warrior's Woman* are a *distinguishing* feature.

Similarly, the inspection of the alleged similarity between the punishment meted out by Tammad and Challen reveals significant differences. Tammad punishes Terry by whipping her, while Challen punishes Tedra by sexually arousing her without providing any release. Moreover, Tammad exhibits no regret about, or dislike of his "responsibility" for punishing Terry. Challen, on the other hand, resorts to *dhaya* juice in order to fortify himself for the unpleasant task of punishing Tedra. Therefore, for the above reasons, no protectible similarity exists between the plot of *The Warrior Within* and that of *Warrior's Woman*.

### 3. *Setting and Pace*

Plaintiff claims that the time frame and settings of the two books are substantially similar. First, plaintiff argues that the period of servitude in both books is one month. Although this is true, the one-month period is subject to different expression in the two books. In *The Warrior Within*, the period of the Terry's enslavement is mentioned only once, when Terry arrives on Rimilia and asks how long her mission will take; she is told that, "'There's less than two weeks until the Great Meeting.... Allow maybe another week for the meeting itself, plus your travel time back here.'" (Ferber Aff. Ex. C at 84) However, Terry's term of enslavement is defined by her mission because her release depends on ensuring that Tammad convinces the other warriors to join the Amalgamation.

By contrast, Tedra's one-month servitude results from the customs of challenge loss. Moreover, a month is both brief enough for Martha to leave Tedra under Challen's dominion, and long enough for Tedra to become pregnant, a condition that seems inevitably concomitant to the romance in romance novels of this genre. (*See, e.g., Fires of Winter,* Ferber Aff. Ex. C) Therefore, plaintiff and defendant have given differing expression to the one-month time frame shared by their respective books.

### 4. *Characters*

■ The protection afforded characters depicted in a creative work is limited. Once again, it is Judge Hand's opinion in *Nichols* that provides the guiding principles:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the origin of the species.

45 F.2d at 121. Ultimately, then, the inquiry, whether applied to plot or characters, is the same; the court must determine whether defendant has so invaded plaintiff's work as to appropriate plaintiff's expression. Expression, as it must, remains for the most part undefined, except only as it is distinguished from uncopyrightable ideas or *scenes a faire,* concepts which themselves resist precise definition or easy application. In attempting to refine the inquiry as to characters, the Second Circuit has stated: "Stirring one's memory of a copyrighted character is not the same as appearing to be substantially

similar to that character, and only the latter is infringement." *Warner Bros.*, 720 F.2d at 242; *see also Smith v. Weinstein*, 578 F.Supp. 1297, 1303 (D.C.N.Y.1984) ("No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines."), *aff'd without op.*, 738 F.2d 419 (2d Cir.1984).

In the case at hand, plaintiff contends that the following characters are substantially similar: (1) Terry and Tedra; (2) Tammad and Challen; and (3) Murdock and Martha. (Sutak Aff. ¶¶ 20–21) However, not only are plaintiff's characters dissimilar to defendant's, but, apart from Terry, they also seem undeveloped to the point of being "stock" characters and therefore ineligible for copyright protection. *Jones v. C.B.S., Inc.*, 733 F.Supp. 748, 753 (S.D.N.Y.1990).

Moreover, plaintiff admits that "defendant colored the main characters with some differences, notably by giving her female protagonist (Tedra) a wise-cracking sense of humor which her male antagonist (Challan [*sic*]) responds well to, thus producing a material change to the *mood* of *The Warrior Within.* (Pl. Mem. at 78 (emphasis in original); *see also* Sutak Aff. ¶ 10 ("Tedra does have some distinguishing characteristics from Terry.... Terry is a serious young woman in *The Warrior Within.* Tedra wise-cracks her way through *Warrior's Woman.* Moreover, Tedra, unlike Terry, is a virgin who looks forward to sex at the start. Hence, the difference in mood.") In fact, beyond Terry's and Tedra's independent, strong-willed personalities, and their elite statuses arising from their given talents, Terry and Tedra share no specific similarities.

Nonetheless, plaintiff argues that Terry and Tedra perform similar functions—that is, plaintiff alleges that both Terry and Tedra act as an "ambassador and trade negotiator." (Sutak Aff. ¶ 9) However, not only is this alleged similarity too broad and undeveloped to be the appropriate subject of copyright protection, *see Nichols*, 45 F.2d at 121, but that description also is false as applied to Tedra. Tedra is forced by a military coup to leave Kystran and is "world-discovering" in order to avoid being captured by Sha–Ka'ari warriors. Furthermore, once Tedra arrives on Sha–Ka'an, she decides that her primary purpose is to raise an army to overthrow the Sha–Ka'ari. Therefore, plaintiff's claims that Terry's and Tedra's "mission" are substantially similar is simply wrong.

Moreover, plaintiff's claim that Tammad and Challen are substantially similar fails by plaintiff's own admission. As plaintiff concedes, both Tammad and Challen are versions of the "Conan" he-man and, as such, are not copyrightable. (Sutak Aff. ¶¶ 15, 17)

Finally, plaintiff's allegation that Murdock and Martha perform similar roles vis-a-vis Terry and Tedra, respectively, is wrong as well. Murdock's only function in *The Warrior Within* is to arrange Terry's servitude. Martha, on the other hand is a unique mix of machine and human, who serves as foil for the development of Tedra's character. Therefore, Terry is the only character in *The Warrior Within* sufficiently developed to be the subject of copyright protection. And, by plaintiff's own admission, the specific expression of Terry's and Tedra's characters differs.

### 5. *Dialogue*

Finally, plaintiff argues that *Warrior's Woman* contains dialogue and speech patterns that are substantially similar to those contained in *The Warrior Within.* (*See* Sutak Aff. ¶ 14; Green Aff. ¶¶ 5–13) For example, plaintiff points out that both Terry and Tedra address Tammad and Challen, respectively, as warrior. (Sutak Aff. ¶ 14) However, as plaintiff concedes, "cliched language, phrases, and expressions conveying an idea that is typically expressed in a limited number of stereotypical fashions are not protectible in and of themselves." (*Id.* ¶ 14 n. 1) Moreover, since both Tammad and Challen are warriors, one wonders how else they might be addressed.

Plaintiff also points to an alleged similarity between Tammad telling Terry " 'I do not believe you could easily lift a sword,' " (Ferber Aff. Ex. C at 10), and Challen telling Tedra that, "You could not even lift a warrior's sword." (*Id.* Ex. E at 81) However,

this dialogue, too, is hackneyed treatment of the warrior-hero theme, and therefore not properly the subject of copyright protection. *See Zambito*, 613 F.Supp. at 1112.

Finally, plaintiff claims that defendant has improperly appropriated the syntax of Tammad's speech by giving Challen substantially similar syntax. (*See* Green. Aff. ¶¶ 6–13) Specifically, plaintiff argues that Tammad's and Challen's syntax is substantially similar because both employ (i) "the 'do you' directive" (*id.* ¶¶ 7–8), (ii) "the 'do you' conjunctive" (*id.* ¶ 9), (iii) "use of the definite article 'the' before a proper name" (*id.* ¶ 10), and (iv) "awkward-sounding pronoun construction." (*Id.* ¶ 11) However, not only has defendant supplied numerous examples of use of such speech patterns in other romance novels (*see* Stein Aff. ¶ 11), but plaintiff also has conceded that she did not invent "any one of these unorthodox word usages or phrase constructions." (Green Aff. ¶ 12)

Nonetheless, plaintiff argues that "the combination of all these linguistic devices into one alien dialect, or its English equivalent ... is [her] own." (*Id.* ¶ 13) However, plaintiff concedes that defendant "infrequently" employed the " 'do you' directive" construction. (Green Aff. ¶ 8) In addition, defendant, herself, previously has employed the " 'do you' conjunctive," *e.g.*, "Do you seek to cause deliberate mischief, woman, you will be punished' " (Ferber Aff. Ex. E at 136). (*See* Stein Aff. ¶ 11) Moreover, in *Warrior's Woman*, only Corth precedes proper names with the definite article "the" (Green Aff. ¶ 10), distinguishing his speech from that of human Kystranis. Therefore, the only significant speech pattern shared by Tammad and Challen is awkward syntax. Because plaintiff herself argues that Tammad's barbarian dialect is original only to the extent that she combined various unoriginal word usages and sentence structures, her claim cannot stand on defendant's appropriation, at most, of Tammad's awkward sentence structure. At bottom, what both authors are showing, each in her own way, is that warriors in pulp fiction talk more like Tarzan than like Lord Chesterfield. *See Burroughs v. Metro–Goldwyn–Mayer, Inc.*, 683 F.2d 610, 630 n. 20 (2d Cir.1982) (sample of Tarzan-Jane dialogue). That is not surprising, nor is it copyright infringement. Defendant has appropriated no elements of *The Warrior Within's* copyrightable dialogue or barbarian dialect.

\* \* \* \* \* \*

Because, based on the differences discussed above, no reasonable juror could find the works substantially similar and because the few similarities between *The Warrior Within* and *Warrior's Woman* involve noncopyrightable elements of plaintiff's work, defendant's motion for summary judgment is granted and the complaint is dismissed.

SO ORDERED: