Leon ARDEN, Plaintiff,

v.

COLUMBIA PICTURES INDUSTRIES, INC., Danny Rubin, Harold Ramis, and Trevor Albert, Defendants.

No. 95 Civ. 252 (DC).

United States District Court, S.D. New York.

Dec. 7, 1995.

Bordelon & Hoag by Bruce V. Bordelon, Susan V. Hoag, New York City, for plaintiff.

Pryor, Cashman, Sherman & Flynn by Stephen F. Huff, Tom J. Ferber, Jeff Sanders, New York City, for defendants.

## *OPINION*

CHIN, District Judge.

In 1981, plaintiff Leon Arden published a novel, *One Fine Day* (or the "Novel"), which told the story of a man trapped in a repeating day, forced to live the same day over and over. Some twelve years later, defendants Columbia Pictures Industries, Inc., Danny Rubin, Harold Ramis, and Trevor Albert released their film "Groundhog Day" (or the "Film"), which also featured a man caught in a repeating day.

Plaintiff brought this action alleging that in making the Film defendants copied certain elements of the Novel, including the plot, mood, characters, pace, setting, and sequence of events. Plaintiff seeks relief under the Copyright Act, the Lanham Act and principles of common law. Defendants have moved for summary judgment on the grounds that no substantial similarity exists with respect to protectible elements of the works.

Defendants' motion is granted, for no reasonable jury could find that the two works are substantially similar within the meaning of the copyright laws. Indeed, the copyright laws do not protect ideas, but only particular expressions of ideas. Although the Novel and the Film are based on the same idea, a man trapped in a day that repeats itself over and over, the two works express that idea in

very different ways. The Novel is dark and introspective, featuring witchcraft and an encounter with God. It is marked, for example, by an explosion on an airplane that kills 192 people, the rape of one young woman, and the suicide of another. These tragic events recur as the day repeats itself over and over again. In contrast, the Film is essentially a romantic comedy about an arrogant, self-centered man who evolves into a sensitive, caring person who, for example, in his repeating day, saves a boy falling out of a tree, changes a flat tire for several elderly women, and learns to play the piano. Any similarities between the Novel and the Film relate only to unprotectible ideas, concepts, or abstractions. Accordingly, the complaint is dismissed.

### BACKGROUND

#### A. *One Fine Day*

The Novel tells the story of Robinson Blake ("Rob"), a bachelor in his mid-thirties who experiences the unusual phenomenon of a repeating day. As this day recurs, Rob pursues various goals, including discovery of the reason for the phenomenon, a love affair with his boss's wife, Philippa, and the rescue of his former love interest, Milly, from her attempted suicide. After many recurrences of the repeating day, as well as encounters with witchcraft and with God, Rob ultimately attains these goals.

The Novel begins with Rob ruminating about life's endless beginnings, including the daily routine of waking and getting ready for work. In an effort to break this monotony, Rob has wired a tape recorder to an automatic timer, which awakens him this morning to the sound of his own voice shouting "Wake up you lazy bastard." He looks at a print on the wall, noticing the sunlight touching the lower right-hand corner of the picture frame. Rob finds his slippers and prepares his breakfast, listening to the radio as he gets ready for work. As Rob leaves his apartment, he hears the phone ringing, and thinks that it is a call from Milly, his secretary with whom he has been engaged in a love affair. Without answering the phone, Rob locks the apartment and upon entering the hallway

sees an attractive red-headed tenant as she steps into the elevator.

On the way to the subway Rob notices that two cars have collided in front of his building, sees a man lose his hat in the wind, and buys a newspaper from a street vendor. Rob rides on the subway and then walks to his office, passing a derelict who falls to the ground and is aided by another passersby. Once inside the office building, Rob encounters Vince, the elevator man, who makes a vain attempt at humor. Arriving at work early, Rob sits in his office and contemplates his planned breakup with Milly, which he has postponed numerous times. He reflects upon the start of his relationship with the somewhat plain and sorrowful Milly, remembering how she gave him a ride to a business project in Vermont, as she was driving there to visit her mother. When Rob was no longer needed for the project, Milly offered to let him stay at her mother's home. Murray Scanlan, Rob's boss, interrupts this daydream, and asks Rob to write down a recipe for Philippa, Scanlan's wife, who is expected to stop by the office that day.

Shortly thereafter Milly arrives at the office and the workday begins. After working for a few hours, Milly guesses what is on Rob's mind and asks him if he wants to end their relationship. His delay in answering indicates that he does. Milly valiantly pulls herself together and they continue working until Scanlan summons Rob to deliver the recipe to Philippa, who is waiting in her husband's office.

Upon arriving in Scanlan's office, Rob lusts after Philippa, reminiscing about a work-related weekend trip during which he and Philippa enjoyed a late-night swim. After Scanlan leaves his office to speak to another employee, Philippa tells Rob about a dream she had had that night, when Scanlan interrupts to berate Rob for editing a paragraph of a pamphlet that Scanlan had written. Rob returns to his office and is comforted by Philippa, who encourages him to stand up to her husband, starting with leaving work to spend the rest of the day with her. Unable to challenge his boss, Rob regretfully declines her invitation, works for the afternoon,

and eventually returns home to his apartment.

Back at his apartment, Rob spends the evening listening to music, thinking about Philippa, and reading. The telephone rings, but Rob does not answer it because he believes Milly is calling. After eight more unanswered calls the ringing finally stops. Rob watches the news on television, the top stories including the explosion of a Pan Am airplane and the rape of a woman in the laundry room of a nearby apartment building. Rob then goes to bed, first changing the message on his tape recorder to a gentler greeting, leaving the time set for seven-thirty.

The following morning at seven-thirty Rob again hears the sound of his first, offensive message. Believing he set the tape in the wrong place, Rob prepares for work as usual. He leaves the apartment and as he locks the door hears the phone ring. Again Rob sees the red-headed woman, whom he now refers to as "Her Majesty," in the hallway, and rides downstairs in the elevator with her, attempting unsuccessfully to start a conversation.

As Rob leaves the apartment building, two cars crash in the street. Rob remembers that a similar accident took place the day before, but does not think much of it and continues on his way to work. After his daily subway ride to work, Rob again sees that the derelict has fallen. Realizing that something is wrong, Rob checks the date on his newspaper—it reads April 15, yesterday's date. Thinking that he has been sold an old newspaper, Rob checks a pile of newspapers at another newsstand, but each reads "Monday, April 15." After experiencing a moment of shock, Rob enters his office building, believing that he must be working too much. The elevator man repeats yesterday's jokes, and again Scanlan enters Rob's office, asking for the recipe for Philippa. Concluding that he must be ill, Rob phones his doctor's office, but no one has arrived there yet.

Milly arrives at work and after a while realizes that Rob wants to end their relationship. Again Scanlan calls Rob to his office, where Philippa is waiting for the recipe. Scanlan leaves his office, and Rob and Philippa talk. Rob says he has been experiencing deja vu, and tells Philippa, who has no memory of the previous day's events, that in a moment Scanlan will burst into the office and yell at Rob. As predicted, Scanlan enters the room, screaming at Rob. This time Rob grabs the pamphlet, tears it up, and shouts at Scanlan, "SHUT UP!" Rob decides to leave for the day, and Philippa follows him. He tells Philippa that he is experiencing a repeating day. Again Rob calls his doctor, but the doctor is unable to see Rob for three days. Rob then calls a psychiatrist, who is out to lunch.

Returning to his apartment, Rob again receives nine phone calls in succession. Rob drinks and listens to music to distract himself, and later watches the same stories on the nightly news. Rob decides to go to bed; this time he removes the old cassette from the tape recorder and records another new wake-up message.

The following morning Rob awakens to the original message and upon discovering that it is again Monday, April 15, comes to believe that he is dead and is experiencing hell. Milly calls again, Rob hears the accident through the window, sees the man lose his hat in the wind, watches Her Majesty walking toward the subway station, etc.

Rob realizes that he can do whatever he wishes without consequence, because at midnight all will be erased. Recognizing his freedom to act with abandon and the potential enjoyment this lack of consequences presents, Rob concludes that he cannot be in hell. Rather, Rob reasons that he must be in purgatory, from which he can earn his release by performing good works. Thus, Rob donates three-quarters of his life's savings to the United Cancer Fund, prevents the rape of the woman in the laundry room, and calls the airport anonymously to report a bomb on the Pan Am flight.

Rob tries to escape the trap by flying to Los Angeles. When the clock strikes midnight (New York time), however, Rob is back in his bed again, listening to the sound of his own voice. After drowning his sorrows in brandy, Rob rides the elevator downstairs with Her Majesty, whom he proceeds to

grab. Rob takes advantage of the knowledge he has learned from past repetitions of the day to explain his actions to Her Majesty and to pursue Philippa. As the day continues to repeat, Rob realizes that he is not in purgatory.

In a break from the repeating day, Rob remembers the beginning of his relationship with Milly, picking up where his earlier remembrances left off, at the Vermont cottage of Mrs. Hawkmann, Milly's overbearing mother. Mrs. Hawkmann discusses her daughter's love life (or lack thereof) with Rob. Shortly thereafter Rob seduces Milly, marking the beginning of their love affair. For approximately fifteen pages Rob reminisces about his affair with Milly, which continued until his feelings for her ceased abruptly.

Returning to the trap of the repeating day, Rob continues to exploit his new-found freedom from consequence, eating expensive meals and declaring his love to Philippa. He uses his knowledge of the dream Philippa described to him to seduce her while her husband is at work.

One evening Rob answers the telephone and discovers that Milly has killed herself. Rob rushes to Milly's apartment, finds the police there, and fervently hopes that she will be alive again at midnight. The next morning Rob calls Milly to make sure that she is still alive. Upon discovering that she is, Rob determines that the solution to his conundrum is to prevent Milly's suicide. Thus, he spends that day and night with Milly, pretending that he still cares for her. The next morning Rob wakes up alone, to the sound of his own voice repeating the original message. Upon realizing that saving Milly did not make a difference, he becomes enraged and breaks the tape recorder by pounding upon it with a chair.

When Rob finally calms down, he gazes at the print on the wall and notices that each day the sunlight has hit a different spot on the painting; this leads him to believe that there is something wrong with the sun, something that he does not understand. Again Rob visits Philippa and seduces her. That evening Rob saves Milly, who tells him about massive tidal waves that have been striking various parts of the earth, causing widespread flooding and disaster.

The next day Rob again seduces Philippa while her husband is at work. That evening Rob again prevents Milly's suicide. Rob continues to spend the day with Philippa and the evening with Milly. Becoming tired of saving Milly, Rob decides to enlist Mrs. Hawkmann's help, but is unable to contact her.

During their days together, Rob and Philippa eat lunch at various restaurants. On one occasion, Rob spots Mrs. Hawkmann walking by the restaurant. Rob chases Mrs. Hawkmann, follows her onto a bus, and approaches her to discuss Milly. Rob tells Mrs. Hawkmann that Milly is suicidal and asks her to watch over Milly for one night. Mrs. Hawkmann states that she and Milly are not speaking and that he should save her. Finally, Rob convinces Mrs. Hawkmann to attend to Milly, but Mrs. Hawkmann manages to disappear, leaving Rob to save Milly.

While eating lunch with Philippa the next day at the same restaurant, Rob anxiously looks out the window for Mrs. Hawkmann. To Rob's bewilderment, Mrs. Hawkmann is nowhere to be found. Rob takes a train to Vermont in search of Milly's mother. When he finds the house locked, Rob breaks in to look for Mrs. Hawkmann. Searching the cellar, Rob discovers signs that Mrs. Hawkmann has been practicing witchcraft, including a circular band of black material spread out on the floor with various items placed on it, as well as a clock with its hands tied to a small straw doll with one of Rob's neckties. The doll's feet are bound with a string of beads similar to the kind that Milly wears. Rob tries to destroy Mrs. Hawkmann's creation, breaking the clock. Thinking he has finally stopped the repeating day, Rob calls Milly, telling her to wait for him and not to do anything rash in the meantime. He rushes back to New York, and calls Milly as soon as he arrives at Grand Central Station, only to find that the police officer is at her apartment and that Milly is dead.

The next day Rob is at Milly's apartment, telling her that he discovered that her mother practices witchcraft. Rob insists that Milly tell him the entire story. Milly tells Rob

that her mother cast a spell to cause the two of them to fall in love, which Milly discovered when she stumbled upon a voodoo doll during a visit with her mother. Milly convinced her mother to remove the spell, and Rob was no longer in love with Milly, but Milly remained in love with Rob. Milly tells Rob that her mother is staying at the Westminster Hotel, and Rob rushes there, only to find that Mrs. Hawkmann departed that morning at eight o'clock. Realizing that he will never be able to reach the Manhattan hotel from his Queens apartment in time to stop Mrs. Hawkmann's eight o'clock departure, Rob tries to think of a way to stop her.

Rob hires Vince, the elevator man, to follow Mrs. Hawkmann and learns that she is at Kennedy Airport, about to take a flight to London aboard the airplane that explodes each day. Rob purchases a ticket, instructing Vince to report the bomb. Aboard the airplane, Rob confronts Mrs. Hawkmann, who explains that she was merely using white magic to help her daughter. The clairvoyant Mrs. Hawkmann had seen Milly's suicide and made a pact with the devil to repeat the day until she could save her daughter. Mrs. Hawkmann does not know why the day has continued to repeat, and her efforts to stop it have failed.

Meanwhile, as the flight continues, Rob grows worried that Vince has not reported the bomb. A child aboard the airplane leads Rob into the restroom, the light goes out, and when Rob turns it on again he is in his bedroom closet, and the child is gone. Her Majesty appears at the door and surprises Rob by remembering the day he fondled her in the elevator. God, in the form of Her Majesty, proceeds to explain that the earth's spin has been slowing down, requiring intervention to prevent the earth from stopping entirely. To solve the problem, God adjusted the earth's rotation through numerous repetitions of a day. This happened to be the very day on which Milly committed suicide.

Back on the airplane, Rob discovers that Mrs. Hawkmann has reported the bomb herself. Now that God has fixed the problem with the earth's spin, the day will stop repeating and this time Rob *must* prevent Milly's suicide. To be certain her daughter would not kill herself, however, Mrs. Hawkmann has already sent Milly a telegram purporting to be a marriage proposal from Rob. That night at midnight Rob remains in London, to his delight.

After flying back to New York the next day, Mrs. Hawkmann calls Milly and finds her still alive. Rob visits Philippa to profess his love for her—Philippa, however, believes that Rob is engaged to Milly. Scanlan returns to the apartment, and Rob reveals that he and Philippa had an affair, describing things about Philippa that he could not have known otherwise. Scanlan attacks Rob, and fires him. Rob returns to the office, where he finds Milly, and accepts that he will have to marry Milly to keep her from killing herself. Meanwhile, Philippa calls Rob and asks him to meet her for lunch.

At the restaurant, Rob discovers that Philippa thinks he is the reincarnation of her long lost love who died years ago, but realizes that he is not when he is unable to name the gift given to her by her former lover. In her anger, Philippa persuades Rob to kiss her in front of Milly, who, unbeknownst to Rob, is looking at them through a window. Rob runs after Milly; shortly thereafter, however, Mrs. Hawkmann succeeds in removing the spell from her daughter, and suddenly Milly is no longer in love with Rob, leaving him free to pursue Philippa.

### B. *"Groundhog Day"*

Columbia Pictures released the motion picture "Groundhog Day" for theatrical exhibition in the United States in 1993. Defendants Danny Rubin and Harold Ramis coauthored the screenplay for the Film, purportedly on the basis of a story written by Danny Rubin. Trevor Albert and Harold Ramis produced the Film. "Groundhog Day" involves Phil Connors ("Phil"), a Pittsburgh television weatherman in his mid-thirties portrayed by Bill Murray. Accompanied by a camera man, Larry (played by Chris Elliott), and his producer, Rita (played by Andie MacDowell), the self-absorbed Phil travels to Punxsutawney, Pennsylvania to cover the annual Groundhog Day festivities taking place there. Like Rob in *One Fine Day*, Phil also experiences a repeating day,

and, after numerous comical repetitions of Groundhog Day, eventually falls in love with Rita.

The Film opens with shots of white clouds blowing across a blue sky, then cuts to a shot of Phil giving the weather report. He is standing in front of a blank blue screen, gesturing as he describes the weather patterns and blowing to show the direction of the wind; the viewers see Phil standing before a map of the United States. Phil joins a newswoman at the desk and says he is going to Punxsutawney for the fourth time to cover the annual Groundhog Day festivities, expressing disdain at this assignment. Phil and his replacement weatherman watch Rita, the new producer, as she playfully experiments with the weather screen.

The next scene shows the white production van on the highway travelling to Punxsutawney. Phil tells Larry that this is the last time Phil is going to cover Groundhog Day. Phil makes fun of the groundhog, who is named Punxsutawney Phil.

The group arrives in Punxsutawney, and the van pulls up in front of the Pennsylvania Hotel. Phil states that he cannot stay there—he stayed there on a prior visit to Punxsutawney and found the place to be a fleabag. Larry calls Phil a prima donna and Rita informs Phil that Larry is merely dropping her off at the hotel—she has arranged for Phil to spend the night at a bed and breakfast. Rita offers her assistance to Phil if there is anything he should need and Phil makes the following comment to Rita: "Would you help me with my pelvic tilt?" Rita takes this somewhat rude gesture in stride and laughs it off.

The following morning, the black-and-white numbers of Phil's alarm clock are seen changing from 5:59 to 6:00 and the radio goes on, playing Sonny and Cher's "I Got You Babe." The sound of Sonny Bono crooning "Put your little hand in mine, there ain't no hill or mountain we can't climb ..." is heard as Phil wakes up. As the song fades out, the radio announcer says "OK campers, rise and shine ..." and gives the weather report, which calls for a blizzard. As he is getting ready, Phil looks out the window and sees a pickup truck turning a corner. Dressed and ready for Groundhog Day, Phil leaves his room and enters the hallway, where he is greeted by a heavy, dark-haired man who wishes him good morning and asks if he thinks there will be six more weeks of winter.

Phil goes downstairs to the dining room, where the hostess, Mrs. Lancaster, asks if he slept well and offers him coffee. Sarcastically, Phil asks if they serve espresso or cappuccino, and when she responds that they do not, settles for regular coffee. Phil can be seen rolling his eyes up as Mrs. Lancaster talks excitedly about Groundhog Day. When she makes small talk about the weather, Phil provides her with a full report, complete with typical weather forecaster's gestures. Phil leaves the bed and breakfast, predicting that the chance of his departure that day is one-hundred percent.

On his way to the Groundhog Day festivities at Gobbler's Knob, Phil passes a disheveled old man asking for a hand-out. Walking further, Phil is approached by the pushy Ned Ryerson, a nerdy life insurance salesman who attended high school with Phil. Trying to avoid the persistent Ned, Phil steps off the curb into a deep puddle of water. Phil arrives at Gobbler's Knob, which is bustling with music and people. The enthusiastic Rita calls Phil's name, and Phil joins Rita and Larry to prepare for their coverage of Groundhog Day. Rita straightens Phil's tie, and Phil asks in a conceited manner whether Rita slept alright without him. This angers Rita, but her anger is soon forgotten with the start of "groundhog time."

A man dressed in a black suit and top hat raps on the little door of Punxsutawney Phil's abode and the crowd cheers—Rita gushes at how cute the groundhog is and Phil makes fun of it. The master of ceremonies announces that the groundhog has seen his shadow, and therefore winter will last for another six weeks. In a sarcastic tone, Phil says "So long" to the viewers, upsetting Rita and prompting Larry to refer to Phil as a prima donna.

As Phil, Larry, and Rita leave Punxsutawney, a blizzard hits, and the van is stopped en route. Phil, who earlier predicted only a twenty percent chance of snow, denies that it

is a blizzard. Unable to leave Punxsutawney, Phil goes to the hotel bar, where Rita and Larry approach him and ask if he would like to join them in attending the Groundhog Day dinner. Phil declines ungraciously.

Back at the bed and breakfast, Phil takes a shower, but upon discovering that there is no hot water, he screams and hurriedly jumps out. The next shot shows Phil's alarm clock as the numbers change from 5:59 to 6:00, and the radio can be heard playing "Put your little hand in mine . . . ." The radio announcer again says "OK campers, rise and shine . . ." and Phil quips that the station must be playing yesterday's tape. Phil looks out the window and sees the same scene in the street below, and the same pickup truck rounds the corner. Encountering the same man in the hallway, Phil grabs the man and asks him what day it is. The man responds that it is Groundhog Day.

Downstairs in the dining room, Mrs. Lancaster asks Phil if he slept well and whether he would like coffee. On his way to Gobbler's Knob Phil passes the same derelict, is approached by Ned Ryerson, and steps in the puddle by the curb. When Phil arrives at Gobbler's Knob Rita calls him and he joins her and Larry. Phil tells Rita that he feels strange, but she interrupts because it is groundhog time again. After the groundhog sees his shadow, Phil leaves. He takes another cold shower and the blizzard hits Punxsutawney. Before going to sleep, Phil breaks a pencil and leaves the pieces next to his bed. The next morning the numbers on the clock are shown changing from 5:59 to 6:00 and the radio plays the same lyrics from "I Got You Babe." Phil picks up the pencil, which is no longer broken, meets the same man in the hallway, and runs downstairs and out the door as Mrs. Lancaster asks "Did you sleep well?" Phil passes the old man, pushes Ned Ryerson aside, and steps in the puddle. Rita calls Phil and he tells her that they have to talk and asks her to meet him at a nearby diner.

In the next scene, Phil and Rita are sitting at a table in the diner, talking. Someone breaks a dish, prompting two local men to jeer. Rita asks Phil why he is too sick to work. Phil tells Rita that he has been reliving the same day over and over and asks for her help. She replies that he should get his head examined if he expects her to believe him.

The Film cuts to a shot of Phil at a doctor's office, viewing x-rays and discussing Phil's condition. The doctor, played by Harold Ramis, tells Phil that he cannot perform a catscan or an MRI—Phil will have to go to Pittsburgh for those tests. Next, Phil visits a young psychiatrist who is unable to provide much help to Phil and suggests that they meet tomorrow.

In the next scene, Phil is in the town bowling alley drinking with two locals from the diner. They leave the bowling alley and head for a car, but neither of the locals is able to drive. Phil takes the wheel and asks the men what they would do if there were no tomorrow. One man replies that there would be no consequences or hangovers, and Phil realizes that he can do whatever he wants to. Phil rams the car into a mailbox, and is chased by a police car. Phil drives on the railroad tracks, with the police car following him, and swerves as a train approaches. Phil is arrested and taken to jail, but wakes up the next day to the sound of Sonny and Cher.

In the dining room, Phil answers Mrs. Lancaster's questions before she even asks them. Phil sees the derelict, punches Ned, and watches another pedestrian step in the puddle. At the diner, Phil indulges in huge quantities of food, drinks coffee, and smokes cigarettes. When Phil shoves an entire piece of cake into his mouth, Rita turns her head in disgust and recites a poem by Sir Walter Scott. When Phil laughs because Rita thinks he is acting this way because he is egocentric, Rita replies that egocentricity is Phil's defining characteristic. Rita leaves.

On his way out, Phil approaches an attractive woman sitting alone in the diner. Without explanation, Phil asks whether she attended the Groundhog Day festivities, and requests such information as her name and the name of the high school she attended. After she responds that she attends the Groundhog Day festivities every year, tells Phil that her name is Nancy Taylor, and

discloses the other requested details, Phil simply walks away.

The next morning the alarm goes off in usual fashion. At Gobbler's Knob, Phil approaches Nancy, pretending that he was in her high school English class. He arranges to meet her later to catch up. That evening, while seducing Nancy, Phil twice calls her Rita; Nancy becomes upset, and Phil asks her to marry him in order to appease her.

The following day Phil is seen watching an armored truck pick up money. He comically predicts the movements of the drivers and steals a bag of cash as they pick up quarters that have fallen. That evening Phil, dressed as a desperado, arrives at a movie theater in a Rolls Royce. He is accompanied by an attractive woman dressed in a maid costume who says she thought they were going to a costume party. The ticket clerk asks Phil "One adult and ?" and Phil replies two adults.

The next day Phil and Rita are walking together at Gobbler's Knob. Phil asks Rita what she would do if she only had one day and invites her for a cup of coffee. At the diner, Phil continues to ask Rita personal questions, tells her that he wants someone like her, and asks her to describe her ideal man. She proceeds to list the qualities she seeks in a man, such as sensitivity, intelligence, the ability to play a musical instrument, and a fondness for children, and Phil claims to have most of those traits.

In the next scene, Phil joins Rita at the hotel bar, where she is reading a book. He offers to buy her a drink, ordering a bourbon for himself, while Rita orders sweet vermouth on the rocks with a twist. The next day the scene is repeated, but this time Phil also orders sweet vermouth on the rocks with a twist, to Rita's astonishment. Rita drinks to world peace; the next day Phil does the same.

Phil and Rita spend time together in Punxsutawney; as Phil warms up to the small town, Rita warms up to Phil. While dining together, Phil learns that Rita studied 19th century French poetry in college, and the next night at dinner Phil recites a poem in French. Phil continues to court Rita—they build a snowman, and when some children

throw a snowball at them, Phil engages in a playful snowball fight, all the while wistfully hoping that someday he will do the same with his own children. At the end of the evening, Phil invites Rita back to his room. They kiss, but Rita hesitates and becomes offended when Phil says that he loves her. Believing the whole day was a means of seducing her, Rita slaps Phil and leaves. This scene occurs repeatedly—Rita is shown slapping Phil numerous times in various settings.

Phil becomes discouraged and depressed, and begins to look very worn. In one humorous scene, a drunken Phil entertains the guests at the bed and breakfast with his knowledge of the responses on the "Jeopardy" television program. Phil's coverage of the Groundhog Day festivities becomes sarcastic.

One morning, Phil bangs his alarm clock in frustration. The following morning, he smashes the clock to the floor, shattering it into pieces. In his frustration, Phil kidnaps Punxsutawney Phil. The police chase Phil, and Larry and Rita trail them. Driving a red pickup truck, Phil breaks through a fence into a construction site. The police think they have trapped Phil, but Phil drives toward the group and over a cliff, crashing on the ground below. As the pickup truck explodes, there is a shot of the numbers 5:59 with flames in the background. Phil wakes up in the bed and breakfast, goes downstairs in his pajamas, and takes the toaster from the dining room buffet table. He brings the toaster into the bathroom and gets into the tub, plugging the toaster into the wall. As Phil puts the toaster into the tub, the lights go out. Phil attempts suicide in various ways, such as walking in front of a truck and jumping off of a building, only to wake up without a scratch the next morning.

Back at the diner, Phil tells Rita of his seeming immortality, and convinces her that he is experiencing a repeating day by naming various people in the diner and reciting details of their lives. He predicts the dropped tray of dishes and Larry's arrival. After spending the day together, Rita and Phil relax in Phil's room. Rita is surprised when Phil is still there at midnight; Phil explains

that the day begins again at 6:00 a.m. Rita decides to stay. At 3:02, Phil and Rita are shown lying in bed. Phil is reading to Rita, who falls asleep. Displaying his newfound tenderness, Phil puts the blanket over her, and tells her how kind she is. He kisses her head, telling Rita of his love for her, as soft music plays in the background.

At 6:00, Phil wakes up alone in bed. He performs various acts of kindness, such as giving money to the derelict, bringing coffee to Larry and Rita, and helping them carry their equipment. Phil decides to take piano lessons, offering the instructor $1000 to give him a lesson today rather than tomorrow. Seeing that the old man is ill, Phil brings him to the hospital, where the old man dies. Despite Phil's efforts to save the man, he dies again the following night.

Covering the Groundhog Day festivities the next morning, Phil gives an endearing speech that wins him the admiration of all. Phil catches a boy who falls from a tree, fixes a flat tire for a group of elderly women, and saves the mayor from choking. Rita goes to the Groundhog Day party at the hotel, where she finds Phil playing the piano, entertaining the crowd. Phil leads the band in another song, then dances with Rita. Numerous people approach Phil to thank him for his kindness. It is now time for the annual bachelor auction, and Phil is the first bachelor to be bid for. Rita outbids Nancy and the waitress from the diner. Outside, Phil makes an ice sculpture of Rita, and she is touched. Phil tells Rita that he loves her and they kiss. The Film jumps to a shot of the alarm clock going off, but this time Rita is still in bed with Phil. Looking out the window, Phil sees snow on the ground. Realizing that it is a new day, Phil kisses Rita. Phil and Rita leave the bed and breakfast together, Phil suggesting that they live in Punxsutawney. The Film ends as Phil and Rita walk off together.

### DISCUSSION

#### A. Copyright Infringement

##### 1. Elements of Claim

To prevail on a claim of copyright infringement, a plaintiff must prove two elements:

"(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991) (citation omitted); *see Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.) ("To establish an infringement of a copyright, a plaintiff must show both ownership of a copyright and that defendant copied the protected material without authorization.") (citations omitted), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). As plaintiff has provided the Court with a copy of the copyright registration certificate for *One Fine Day,* I will assume that a valid copyright exists for the purposes of this motion.[1] *See* 17 U.S.C. § 410(c) (registration certificate made before or within five years of first publication is prima facie evidence of copyright's validity); *Rogers,* 960 F.2d at 306 (registration certificate creates rebuttable presumption of copyright ownership).

The second element, defendant's copying of protected work, in turn consists of two requirements: actual copying and improper appropriation. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–40 (2d Cir. 1992); *Green v. Lindsey,* 885 F.Supp. 469, 477–78 (S.D.N.Y.1992), *aff'd,* 9 F.3d 1537 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1318, 127 L.Ed.2d 667 (1994); *see Walker,* 784 F.2d at 48. Actual copying may be established by direct evidence or by proof of defendant's access to plaintiff's work and sufficient similarity between the works to support an inference of copying. *See Laureyssens,* 964 F.2d at 140; *Walker,* 784 F.2d at 48; *Green,* 885 F.Supp. at 479. To establish improper appropriation, plaintiff must also show that substantial similarity exists with respect to protectible elements of the works. *Laureyssens,* 964 F.2d at 140 ("If actual copying is established, a plaintiff must then show that the copying amounts to an

---

1. Defendants also concede copyright ownership for purposes of their motion. Memorandum of

Law in Support of Defendants' Motion for Summary Judgment ("Def.Mem.") at 2 n. 2.

improper appropriation by demonstrating that substantial similarity to protected material exists between the two works."); *Walker,* 784 F.2d at 48; *see Kregos v. Associated Press,* 3 F.3d 656, 662 (2d Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *see also* 3 Melville B. and David Nimmer, *Nimmer on Copyright* §§ 13.01[B], at 13–13; 13.03[A], at 13–29 ("copying as a factual matter" is established by proving "access and probative similarity," while "actionable copying" requires proof of substantial similarity).

For purposes of this motion, defendants concede access to plaintiff's Novel and copying of plaintiff's idea of a repeating day. *See* Def.Mem. at 5. Thus, the issue presented by this summary judgment motion is whether substantial similarities exist between the Novel and the Film with respect to elements protected under the copyright law. *See Walker,* 784 F.2d at 48; *Kretschmer v. Warner Bros.,* 1994 WL 259814, at *7 (S.D.N.Y. June 8, 1994).

■ In determining whether two works share substantially similar protectible elements, the Second Circuit applies the "ordinary observer test." *Rogers,* 960 F.2d at 307. Courts are to ask "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id.* (*citing Ideal Toy Corp. v. Fab–Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966)); *see Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 765 (2d Cir. 1991) (court asked "whether 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'") (*quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960)); *Walker,* 784 F.2d at 51 (Second Circuit generally judges substantial similarity "by the spontaneous response of the ordinary lay observer.").

■ Courts may also compare the "total concept and feel" of the works at issue in assessing substantial similarity of a film and a literary work.[2] *See, e.g., Kretschmer,* 1994 WL 259814, at *9; *Denker v. Uhry,* 820 F.Supp. 722, 731 (S.D.N.Y.1992) (*citing Reyher,* 533 F.2d at 92), *aff'd,* 996 F.2d 301 (2d Cir.1993).

■ It is well settled that copyright law only protects plaintiff's particular expression of his ideas, not the ideas themselves.[3] 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea ... [or] concept ... regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Rogers,* 960 F.2d at 308 ("What is protected is the original or unique way that an author expresses those ideas...."); *Walker,* 784 F.2d at 48. Thus, upon examining the works, courts must determine "'whether the similarities shared by the works are something more than mere generalized idea[s] or themes.'" *Walker,* 784 F.2d at 48–49 (*quoting Warner Bros. v. American Broadcasting Cos.,* 654 F.2d 204, 208 (2d Cir.1981) (*Warner I* )); *see Reyher,* 533 F.2d at 91 ("[T]he essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characteriza-

2. Plaintiff asserts that the "total concept and feel" of the works is not a proper consideration in assessing substantial similarity in this case because the works at issue are complex works of fiction, while the case that originated the total concept and feel analysis involved simple children's stories. Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.Mem.") at 17 (discussing *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)). Recent cases, however, have considered differences in total concept and feel in determining whether a film infringes upon the copyright held in a book. *See Green,* 885 F.Supp. at 481–82 ("[C]ourts have applied the total concept and feel test to all manner of liter-

ary and/or dramatic works...."). Thus, the total concept and feel of *One Fine Day* and of "Groundhog Day" may be considered in assessing substantial similarity.

3. The rationale for this rule has been described as follows: "To grant property status to a mere idea would permit withdrawing the idea from the stock of materials that would otherwise be open to other authors, thereby narrowing the field of thought open for development and exploitation. This effect, it is reasoned, would hinder rather than promote the professed purpose of the copyright laws, i.e., 'the progress of science and useful arts.'" 3 Nimmer § 13.03[B], at 13–69–13–70 (footnotes omitted).

tion."); *Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 239 (2d Cir.1983) (*Warner II*). Because the copyright law only protects the expression of ideas, rather than ideas themselves, it is clear that the idea of a repeating day, even if first conceived by plaintiff, is not protectible.

■ In addition, certain literary or cinematographic elements are not protected even if they take the form of concrete expression, such as "stock" themes or "*scenes a faire.*" *Walker,* 784 F.2d at 50; 3 Nimmer § 13.03[B][4], at 13–80–13–82. Stock themes, or themes that are "commonly linked to a particular genre," are only protected under the copyright law "to the extent they are given unique ... expression in an original creation." *Walker,* 784 F.2d at 50. For example, the "familiar figure of the Irish cop" is a stock theme of police fiction. *Id.*

■ *Scenes a faire* are those elements of a work "that necessarily result from the choice of a setting or situation," *Walker,* 784 F.2d at 50, or " 'sequences of events which necessarily follow from a common theme.' " *Green,* 885 F.Supp. at 478 (*quoting Reyher,* 533 F.2d at 91); *see Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir.) (*scenes a faire* are those "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic.") (citation omitted), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). In *Walker,* which dealt with a novel and a film that both portrayed the 41st Precinct in the South Bronx, the Second Circuit found that depictions of drunks, prostitutes, rodents, and abandoned cars were unprotectible *scenes a faire.* 784 F.2d at 50.

In assessing whether the works are substantially similar with respect to protectible elements, courts are guided by the goal of copyright law to promote creativity. *Warner II,* 720 F.2d at 240. As the Second Circuit stated in *Warner II,*

> [b]y assuring the author of an original work the exclusive benefits of whatever commercial success his or her work enjoys, the law obviously promotes creativity. At the same time, it can deter the creation of

new works if authors are fearful that their creations will too readily be found to be substantially similar to preexisting works. 720 F.2d at 240.

### 2. Summary Judgment Standards

Summary judgment may be granted only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Kregos,* 3 F.3d at 661. The moving party bears the burden of proving that no genuine issue of material fact exists, and in determining whether any such factual issues exist the court is to draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995); *Kregos,* 3 F.3d at 661.

■ In the context of a copyright infringement claim, summary judgment may be granted when any similarities between the works relate only to non-copyrightable elements or when no reasonable jury could find the two works substantially similar. *Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir.1992); *Walker,* 784 F.2d at 48. For summary judgment to be appropriate, "the lack of substantial similarity between the protectible aspects of the works [must be] 'so clear as to fall outside the range of disputed fact questions' requiring resolution at trial." *Walker,* 784 F.2d at 48 (*quoting Warner II,* 720 F.2d at 239); *see Rogers,* 960 F.2d at 307 (summary judgment "will be denied when the question of substantial similarity is one on which reasonable minds could differ").

As substantial similarity of protectible elements between a book and an allegedly infringing motion picture is assessed through "detailed examination of the works themselves," *see Walker,* 784 F.2d at 49, summary judgment is frequently granted in this context. *See, e.g., Walker,* 784 F.2d at 46–47 (affirming summary judgment in favor of defendants on claim that motion picture "Fort Apache: The Bronx" infringed upon copyright in book *Fort Apache* ); *Kretschmer,* 1994 WL 259814, at *11 (in comparing novella *The Last Tribunal* with motion pic-

ture "Defending Your Life," court granted defendant's motion for summary judgment); *Williams v. Crichton,* 860 F.Supp. 158, 170–71 (S.D.N.Y.1994) (granting summary judgment to defendants on claim alleging that motion picture "Jurassic Park" infringed upon copyright held in series of children's books); *Denker,* 820 F.Supp. at 736 (holding that, as a matter of law, no substantial similarity of protectible elements existed between film "Driving Miss Daisy" and play "Horowitz and Mrs. Washington," two works involving older Jewish individuals who overcome their racism through relationships with black helpers); *Zambito v. Paramount Pictures Corp.,* 613 F.Supp. 1107, 1112 (E.D.N.Y.) (granting summary judgment to defendants on claim alleging that motion picture "Raiders of the Lost Ark" was copied from screenplay "Black Rainbow"), *aff'd,* 788 F.2d 2 (2d Cir.1985); *cf. Green,* 885 F.Supp. at 488 (granting defendant's motion for summary judgment because "no reasonable juror could find the works substantially similar and because the few similarities between [the books] *The Warrior Within* and *Warrior's Woman* involve[d] non-copyrightable elements of plaintiff's work. . . ."). *But cf. Novak v. National Broadcasting Co.,* 716 F.Supp. 745, 753 (S.D.N.Y.1989) (denying defendants' motion for summary judgment because question of fact existed as to substantially similar use of camera technique in comedy skits involving gangsters).

Defendants argue that summary judgment should be granted because no reasonable observer could find substantial similarities between protectible elements of the Novel and the Film. Specifically, defendants contend that "the only similarities between the works in question involve non-copyrightable elements such as basic ideas and abstractions, or unprotectable scenes a faire flowing from these basic elements." Def. Mem. at 9. Plaintiff argues that summary judgment is not appropriate, because fact issues remain concerning the existence of substantial similarities between protectible elements of the Novel and the Film.

■■■■ Upon comparison of the Novel and the Film, I conclude that no reasonable jury could find that the works are substantially similar in terms of protectible elements. Therefore, the defendants' motion for summary judgment is granted. I will now discuss the elements plaintiff asserts are copied from his Novel, namely, the plot, mood, characters and character development, pace, setting, sequence of events, and other specific elements alleged to be substantially similar.

#### a. Plot

Plaintiff asserts that the Film is substantially similar to the Novel with respect to the protectible elements of plot and fundamental structure and essence. I disagree. While both works tell the story of a man who experiences a repeating day, "in moving to the next level of specificity, differences in plot and structure far outweigh this general likeness." *Walker,* 784 F.2d at 49. *One Fine Day* involves a more complex plot than the generally light-hearted comedy "Groundhog Day." The story-line of the Novel is highly detailed and much more developed than that of the Film, featuring dramatic twists that are entirely absent from the Film. In contrast, "Groundhog Day" tells the relatively simple story of Phil's transformation from a self-centered egotist to a sensitive, caring person who falls in love with Rita and with whom Rita is able to fall in love. Thus, the works differ greatly in terms of plot and fundamental essence. Any similarities in structure stem directly from the idea of a repeating day and, hence, are unprotectible.

#### b. Mood

A comparison of the Novel and the Film reveals that no reasonable juror could find any substantial similarity in the mood of the two works. *One Fine Day* is a dark, introspective, mystical work pervaded by Rob's desperation and frustration at his inability to stop the day from repeating and at his varying success in seducing Philippa. In contrast, humor sets the tone of "Groundhog Day," and the Film takes on a romantic mood as Phil develops into a sensitive person and falls in love with Rita. Thus, the works differ greatly in terms of total concept and feel.

### c. Characters and Character Development

Plaintiff asserts that the characters and character development featured in "Groundhog Day" are substantially similar to those in *One Fine Day*. Although Phil and Rob bear superficial similarities, such as the fact that both are bachelors in their thirties, both pursue love interests and are somewhat chauvinistic and self-centered, any such similarities are concepts or ideas that do not reach the level of copyrightable expression.[4] Despite these shared general traits, Phil and Rob are fundamentally different personalities. Phil, portrayed by the well-known comic actor Bill Murray, is a conceited celebrity, while Rob is a somewhat timid low-level manager, unable in the early phase of the Novel to stand up to his boss. In fact, the characters' differences highlight the overall differences between the works: while the Novel tells the story of a man's sexual pursuits and his encounters with mysticism, the Film is essentially a showcase for the comedic talents of Bill Murray.[5] Examining each protagonist as a whole, no reasonable juror could conclude that Rob and Phil are substantially similar characters. Likewise, the female characters in the works are very different; for example, while Rita is a beautiful, positive, self-assured and sweet person, Milly is plain, self-effacing, and suicidal, and Philippa is slightly unstable and dependent upon men.

Plaintiff also argues that the use of similar plot devices, such as each protagonist's sole knowledge of the repeating day[6] and the underdevelopment of other characters, constitutes substantial similarity. Literary devices, however, cannot be copyrighted. *See Denker,* 820 F.Supp. at 732 ("generalized plot devices ... are not entitled to copyright protection."). Thus, any similarity with respect to these elements cannot be the basis of a copyright infringement action. In sum, any similarity between the two characters "exists only at a level of abstractions too basic to permit any inference that defendant[s] wrongfully appropriated any 'expression' of plaintiff's ideas." *Kretschmer,* 1994 WL 259814, at *11, (*quoting Zambito,* 613 F.Supp. at 1112).

### d. Pace

Overall, *One Fine Day* is a slower-paced work than "Groundhog Day." The Novel features a great deal of introspection by Rob, including, for example, a fifteen-page flashback. In contrast, "Groundhog Day" is a relatively fast-paced movie, employing many quick repetitions of the day for comic effect, such as shots of Rita slapping Phil and of Phil's numerous suicide attempts.[7] Moreover, the repeating day in the Novel recurs only approximately 14 times, while the repeating day in the Film recurs many more times—indeed, enough times for Phil to learn, for example, to play the piano and carve ice sculptures.

### e. Setting

The settings of the two works are markedly different. With the exception of introduc-

---

**4.** Plaintiff also contends that the combination of character traits and emotions allegedly shared by the two protagonists amounts to substantially similar protected expression, citing *Warner II,* 720 F.2d at 243. While the protagonists do share some general traits, such as selfishness, and later exhibit altruism and compassion, these traits are expressed through dissimilar details and the characters are developed in very different ways. For instance, while Phil truly becomes a sensitive, caring person, expressed through his genuine compassion for the old man and kindness to others, it can hardly be said that Rob develops true compassion or sheds his selfishness. Rob does attempt to save Milly, but his initial motivation is to stop the day from repeating and he later appears to be driven by guilt as much as by compassion. At the end of the Film, Phil has changed into a completely different person; Rob, in contrast, continues his selfish pursuit of Philippa.

**5.** Indeed, Bill Murray's self-absorbed, sarcastic, wise-cracking Phil in "Groundhog Day" is similar in many respects to other characters he has played, including John Winger in "Stripes" (1981), Dr. Peter Venkman in "Ghostbusters" (1985), and Frank Cross in "Scrooged" (1988).

**6.** As defendants note, others know of Rob's predicament, namely, God and Mrs. Hawkmann.

**7.** While both the Novel and the Film employ a faster pace at times and a slower pace at other times, any such likeness does not render the works substantially similar. *See Williams,* 860 F.Supp. at 168 (noting that similarities in pace "[w]ithout more ... [are] insufficient to create an issue of overall similarity between the works.").

tory scenes in Pittsburgh, "Groundhog Day" is set in Punxsutawney, a small town in Pennsylvania. It is the beginning of February, and the winter weather forms a backdrop to many of the Film's scenes. Phil is trapped in Punxsutawney, and he is particularly frustrated by the fact that, although he is a big city television celebrity, he is stuck in a small town. In contrast, although *One Fine Day* is set primarily in New York City, specifically, Queens and Manhattan, Rob is able to leave New York City, and indeed he travels to Los Angeles, Vermont, and London.

Although both works use restaurant and employment settings, these simply are not a form of expression that can be copyrighted. Any similarity between the two works due to the shared use of these common situations is far too general to be the basis of a copyright infringement action.

### f. Sequence of Events

Upon reviewing the Novel and the Film, it is clear that there is no actionable similarity between the sequence of events depicted in the works. Any similarities in the sequence of events are incidental to the idea of a repeating day [8] or the theme of romance, and as such are unprotected.

### g. Specific Claims of Similarity

Certain elements that appear in both the Novel and the Film, such as the beginning of each day with the main character awakening to the sound of his alarm clock; the repetition of actions, conversations, and events; and the main character's reliving experiences, are necessary aspects of the situation of a repeating day and, therefore, constitute unprotected *scenes a faire*.[9]

Moreover, the elements that plaintiff claims to be substantially similar are expressed in different ways. For example, each morning Rob wakes up to the sound of his own voice shouting "Wake up you lazy bastard." The dreaded sound of this message expresses the themes of repetition and frustration, which are emphasized by Rob's unsuccessful attempts to change the message.[10] In contrast, Phil awakens each day to the cheerful sound of Sonny and Cher singing "I Got You Babe." Thus, the means of expression used in the Film differs from that in the Novel in detail and tone. While both Rob and Phil destroy the alarm clock at some point, each scene is expressed through different details. It can hardly be said that this constitutes a substantial similarity between the works.

Although each protagonist seeks medical and psychiatric assistance for his problem, this is a likely reaction to the experience of a repeating day. Moreover, the works express this idea differently: Rob calls his doctor and a psychiatrist, but is unable to make an appointment, while Phil actually visits a doctor and a psychiatrist.

In addition, the works use different repeated events or "icons of repetition," as plaintiff styles them. The mere use of the literary device of repetition to develop character, plot, or theme does not constitute protected expression. While both Rob and Phil use knowledge gained in previous repetitions of the day to their advantage or to aid others, this exploitation is expressed through different events and details.

While both works contain references to suicide, these references differ drastically. In "Groundhog Day," Phil's repeated suicide attempts are a comic device used to illustrate his frustration and the phenomenon of the repeating day. In the Novel, Rob also briefly considers suicide: "If I had thought it would change my life in some way I would have killed myself then and there. What was the point? A leap off the Brooklyn Bridge would only land me back in bed." *One Fine Day* at 133. This brief reference, however, does not create a substantial similarity be-

---

8. For example, the repeated sequence of mundane daily events cited by plaintiff, *see* Arden Aff. at 8, is a necessary aspect of the repeating day concept.

9. For example, depiction of the respective protagonists waking up at the same time each day to the sound of an alarm clock, while not absolutely essential to the concept of a repeating day, is certainly incidental and commonly linked to such an idea.

10. At one point Rob describes being awakened by his alarm as "being stabbed each morning by my own demented voice." *One Fine Day* at 80.

tween the works. While Phil's suicide attempts are one of many sources of humor in the Film, Milly's suicide attempts play a major role in developing the Novel's plot.

In conclusion, because the only similarities between *One Fine Day* and "Groundhog Day" are insubstantial or pertain to non-copyrightable ideas or unprotected *scenes a faire*, and not to protected expression, summary judgment is appropriate. *See Smith v. Weinstein*, 578 F.Supp. 1297, 1302 (S.D.N.Y.) (noting that "[s]ome similarities exist, but at a level of expression either too general or too insignificant to be protectible."), *aff'd*, 738 F.2d 419 (2d Cir.1984). Accordingly, defendants' motion for summary judgment is hereby granted with respect to the copyright infringement claim.

## B. *Lanham Act Claim*

■ Plaintiff's second claim alleges that defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[11] by falsely representing that "Groundhog Day" was based on an original screenplay by defendants Rubin and Ramis, when, in fact, plaintiff is the source of the story contained in the Film. Defendants argue that summary judgment should be granted in their favor with respect to plaintiff's Lanham Act claim due to the absence of substantial similarity between the two works.

In the first instance, it is not clear whether the Lanham Act applies to a case such as this in which the makers of a film are alleged to have misappropriated a literary work. *See Jones v. CBS, Inc.*, 733 F.Supp. 748, 754 (S.D.N.Y.1990) (noting that "it is not clear that a claim in the nature of copyright may be stated under the Lanham Act ..."). Although the Second Circuit in *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775

(2d Cir.1994), recognized that a false or misleading reference to the origin of a literary work can be the basis of a claim of "reverse passing off"[12] under the Lanham Act, the court observed that the typical reverse passing off claim involves manufactured goods, not written works. 43 F.3d at 780.

Even assuming the Lanham Act applies in this case, however, no reasonable jury could find that defendants falsely designated the origin of "Groundhog Day" by "placing [their names] on what was essentially [plaintiff's] product." *See Waldman*, 43 F.3d at 782–83. In addition, plaintiff has not raised a reasonable fact issue regarding the "likelihood of confusion," an essential element of a Lanham Act claim. *See* 17 U.S.C. § 1125(a)(1)(A); *Waldman*, 43 F.3d at 780 (plaintiff must show that defendant "affixed a false designation of origin to its books, that [defendant] used the false designation in commerce, that the false designation is likely to cause consumer confusion, and that [plaintiffs] are likely to be damaged by the false designation."); Jay Dratler, Jr., *Intellectual Property Law* § 10.01, at 10–2–10–3 (1994). As defendants observe, where works are not substantially similar for purposes of copyright infringement, an accompanying Lanham Act claim often fails because no reasonable jury could find a likelihood of confusion. *See Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir.1980) (noting that "the absence of substantial similarity leaves little basis for asserting a likelihood of consumer confusion ..."); *Jones*, 733 F.Supp. at 754 (stating that substantial similarity is "an essential element of plaintiff's claim to be the originator" of the allegedly infringing work); *Conan Properties, Inc. v. Mattel, Inc.*, 712 F.Supp. 353, 362 (S.D.N.Y.1989); *see also Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir.1984), *cert. denied*, 470 U.S. 1052,

---

11. Section 43(a) of the Lanham Act provides:

(a)(1) Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion ... as to the origin ... of his or her goods ... shall be liable in a civil action by any person who

believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

12. In the context of literary works, the reverse passing off form of false designation of origin consists of " 'the misappropriation of credit properly belonging to the original creator' of the work." 43 F.3d at 780–81 (*quoting Restatement (Third) of Unfair Competition* § 5, cmt. (c) (Tent. Draft No. 1 (1988)).

105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). Because the works at issue in this case lack substantial similarity, there is no basis for a finding of likelihood of confusion sufficient to support a claim under section 43(a) of the Lanham Act. Accordingly, defendants' motion for summary judgment on the Lanham Act claim is granted.

### C. Preemption of State Law Claims Under 17 U.S.C. § 301

Defendants argue that plaintiff's state law claims alleging unfair competition and unjust enrichment, and seeking an accounting, are preempted by section 301(a) of the Copyright Act, 17 U.S.C. § 301(a). Section 301(a) provides, in pertinent part, that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively" by the Copyright Act. 17 U.S.C. § 301(a); see *Warner II*, 720 F.2d at 247.

State law unfair competition claims that assert misappropriation or copying are preempted under section 301(a). *Warner II*, 720 F.2d at 247; *Durham*, 630 F.2d at 919 ("To the extent that ... unfair competition claim seeks protection against ... copying, it is a claim based on a right equivalent to 'exclusive rights within the ... scope of copyright.'"); *Walker*, 784 F.2d at 53; see *Conan Properties*, 712 F.Supp. at 362 n. 18 (noting that Second Circuit has interpreted section 301(a) as preempting state law claims that assert misappropriation, but not state unfair competition claims that allege "passing off"). Plaintiff's state law unfair competition claim reiterates the basis of his copyright infringement claim and contends that "defendants misappropriated [his work] for their own commercial gain and profit...." Cmplt. ¶ 37.[13] As this claim sounds in misappropriation, it is preempted by federal copyright law.

Likewise, plaintiff's claims asserting unjust enrichment and seeking an accounting are preempted under section 301(a). The complaint makes clear that both the unjust enrichment claim and the request for an accounting are based upon defendant's alleged misappropriation of plaintiff's Novel. See Cmplt. ¶¶ 36–44. Because these state law claims are grounded upon the alleged copying of plaintiff's work, they too are preempted by the federal copyright law. See *Selmon v. Hasbro Bradley, Inc.*, 669 F.Supp. 1267, 1273 (S.D.N.Y.1987); *Universal City Studios, Inc. v. Nintendo Co.*, 615 F.Supp. 838, 857 (S.D.N.Y.1985) (citing as alternate rationale preemption of state unjust enrichment claim that sought to vindicate rights protected by copyright law), aff'd, 797 F.2d 70 (2d Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). But see *Werlin v. Reader's Digest Ass'n, Inc.*, 528 F.Supp. 451, 467 (S.D.N.Y.1981) (holding that quasi-contract claim was not preempted by federal copyright law). For the foregoing reasons, plaintiff's state law claims alleging unfair competition and unjust enrichment and seeking an accounting are hereby dismissed as preempted by the federal copyright law.

### CONCLUSION

In reading Mr. Arden's affidavit in opposition to the summary judgment motion, I can appreciate his frustration at seeing his idea of a man trapped in a repeating day used, without his consent, in a movie that has grossed more than $70 million, not one cent of which he has received. Again, however, ideas are not copyrightable, and the law has sought to strike a balance between protecting original works and promoting further creativity, a balance that has resulted in—even assuming defendants did copy Mr. Arden's idea—a creative, entertaining work that is substantially different from his expression of his idea.

Defendants' motion for summary judgment is granted. Judgment shall be entered in favor of defendants dismissing the complaint.

SO ORDERED.

---

**13.** Clearly plaintiff does not allege "passing off," or "falsely representing [one's] goods as those of the trademark owner." *Warner II*, 720 F.2d at 247 (citation omitted).